[No. 22601–1–I.  Division One.  September 17, 1990.]

JEFFREY L. RICHARDS, ET AL, *Appellants*, v. OVERLAKE
HOSPITAL MEDICAL CENTER, ET AL, *Respondents*.

*Peter D. Byrnes, Bradley S. Keller,* and *Michael A. Goldfarb,* for appellants.

*Stephen L. Henley,* for respondents Joneschild.

*Joel D. Cunningham* and *Mary H. Spillane,* for respondents Lux.

*Kathryn M. Battuello,* for respondents Pollack.

*Daniel F. Mullin,* for respondents Haeg.

GROSSE, A.C.J.—Jeffrey and Linda Richards, for themselves and on behalf of their daughter Michelle (collectively known hereafter as Richards), sought damages in a malpractice action against their former family physician, Dr. Haeg, and from The Overlake Hospital High Risk Team physicians, Drs. Joneschild, Lux, and Pollack. Richards

alleged the defendants were negligent in the care of their newborn daughter which resulted in severe neurological deficits. The defendants denied any negligence, claiming the infant had prebirth brain malformation and related birth defects. After a 6–week trial, and lengthy deliberations by the jury, a verdict was returned in favor of the defendants. The Richards moved for a new trial based on grounds of prejudicial juror misconduct. The motion was denied by the trial court. The Richards appeal on the grounds of claimed juror misconduct and on alleged instructional error.

Michelle Richards was born at Overlake Hospital on June 20, 1984. The birth was a difficult one and Dr. Haeg decided to place Michelle in the care of Overlake Hospital's High Risk Team. After her birth it was observed that Michelle was exhibiting characteristics of hypotonia, poor feeding and low blood sugar, problems attributed to perinatal asphyxia. Initially, the child was given glucose intravenously. After the glucose infiltrated, she was treated through oral feedings. Michelle's condition tended to improve while in the hospital. Her blood sugars improved, although test results did fluctuate. At discharge, she was not experiencing clinical hypoglycemia. The High Risk Team also observed symptoms of other birth defects, specifically club feet and dysmorphic physical features (generally, facial). Michelle was referred by the High Risk Team to specialists to evaluate these conditions.

Michelle was discharged and referred to Dr. Haeg for follow–up. He later became concerned that the child was experiencing neurological complications and referred her to a child neurologist for evaluation. Although not specifically told about the possible hypoglycemia at birth, the specialist advised Dr. Haeg that his findings were that the child's condition was probably secondary to perinatal asphyxia and should resolve without specialized care. The next day, after Michelle's blood sugar level dropped significantly and frequent feedings did not elevate this level, Dr. Haeg consulted the neurological specialist once again in addition to

one of the team physicians. Each recommended referral to Children's Hospital. There a diagnosis of hyperinsulinism was made. Further, it was discovered that Michelle had multiple defects including a malformed brain.[1] Other deficits included club feet, abnormal palmar creases, abnormal facial features, and an abnormal pancreas.

At trial there was considerable evidence by both sides as to the cause of the deficits. The Richards' theory was one of misdiagnosis and maltreatment of hypoglycemia, thus causing brain damage and other deficits. The physicians' theory was one of congenital brain malformation and related birth defects.

The case was tried over the course of 6 weeks to a jury. After 6 days of deliberation, the jury returned a 10-to-2 verdict in favor of the defendants. The Richards moved for a new trial on the grounds of prejudicial juror misconduct. They asserted that one juror, Geisler, injected extrinsic evidence in the nature of expert testimony which was wholly without support in the record. This evidence centered on the discussion of whether the mother's illness or flu at 20 weeks of the gestation period could explain the infant's condition and/or deficits. On voir dire it was disclosed that juror Geisler possessed some medical training and was an occupational therapist by profession. Additionally it was disclosed that she had the opportunity in her profession to work with retarded children. The trial court denied the motion for new trial finding the matters raised in the affidavits inhered in the verdict and that the Richards had not established misconduct.

On appeal, the Richards also allege that three of the instructions given by the trial court, specifically 7, 10, and 19, were improper, prejudicial, and prevented a fair trial. Instruction 7 was a standard of care instruction as to the family practitioner. Instruction 10 was a degree of care

---

[1]Partial agenesis of the corpus callosum, associated midline defects including an underdeveloped optic chiasm and hypothalamus, and severely underdeveloped white matter.

instruction indicating to the jury that the degree of care practiced by other members of the medical community is evidence of what might be reasonably prudent, but further indicated that this was not fully dispositive of the issue. Instruction 19 was the instruction placing the level of the burden of proof on the plaintiffs as to the proof necessary to determine the proximate cause of the deficits being "but for the conduct of the defendants" the injuries to the child would not have occurred.

## JUROR MISCONDUCT

The Richards claim the trial court erred in determining they had not established juror misconduct to warrant a new trial. In a case such as this where the alleged juror misconduct is the supposed interjection of new or novel (extrinsic) evidence, the test to determine whether the verdict may be impeached and a new trial warranted is first whether the alleged information actually constituted misconduct and, second, if misconduct did occur whether it affected the verdict. *See Halverson v. Anderson,* 82 Wn.2d 746, 513 P.2d 827 (1973). The injection of information by a juror to fellow jurors, *which is outside the recorded evidence of the trial* and not subject to the protections and limitations of open court proceedings, constitutes juror misconduct. *See generally Halverson v. Anderson, supra; State v. Gobin,* 73 Wn.2d 206, 437 P.2d 389 (1968). Novel or extrinsic evidence is defined as information that is outside all the evidence admitted at trial, either orally or by document.

Appellate courts will generally not examine how the jury collectively or as individuals goes about reaching its verdict. *State v. Gay,* 82 Wash. 423, 438–39, 144 P. 711 (1914); *Gardner [v. Malone,* 60 Wn.2d 836, 841–43, 376 P.2d 651, 379 P.2d 918 (1962)]. An exception to this rule exists where a juror injects novel evidence into the deliberations. This is considered improper because such new evidence will not have been subject to objection, cross examination, explanation, or rebuttal by either party. *Halverson v. Anderson,* 82 Wn.2d 746, 752, 513 P.2d 827 (1973). The trial court will normally review this alleged new evidence and then determine whether the juror's remarks or the new evidence itself probably had a prejudicial

effect on the minds of the other jurors. *Gardner v. Malone, supra* (relying on *State v. Parker,* 25 Wash. 405, 415, 65 P. 776 (1901)). The trial court then has the discretion to grant or deny a new trial after viewing juror affidavits or examining jurors, which will not be overturned absent an abuse of discretion. *Gardner,* at 846.

*Lockwood v. AC&S, Inc.,* 44 Wn. App. 330, 357–58, 722 P.2d 826 (1986), *aff'd,* 109 Wn.2d 235, 744 P.2d 605 (1987).

■■ Initially, with regard to the claims of juror misconduct, it must be noted that a decision of whether the alleged misconduct exists, whether it is prejudicial and whether a mistrial is declared are all matters for the discretion of the trial court. The decision of the trial court will be overturned on appeal only for an abuse of discretion. *State v. Rempel,* 53 Wn. App. 799, 801, 770 P.2d 1058 (1989), *rev'd on other grounds,* 114 Wn.2d 77, 785 P.2d 1134 (1990); *State v. Colbert,* 17 Wn. App. 658, 664–65, 564 P.2d 1182, *review denied,* 89 Wn.2d 1010 (1977). If misconduct is found, great deference is due the trial court's determination that no prejudice occurred. However, greater weight is owed a decision to grant a new trial than a decision not to grant a new trial. *State v. Briggs,* 55 Wn. App. 44, 60, 776 P.2d 1347 (1989); *State v. Cummings,* 31 Wn. App. 427, 430, 642 P.2d 415 (1982). Further, a trial court only abuses its discretion when its decision is manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons. *State ex rel. Carroll v. Junker,* 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

A strong, affirmative showing of juror misconduct is required to impeach a verdict:

> Verdicts should be upheld and the free, frank and secret deliberation upon which they are based held sacrosanct unless (1) the affidavits of the jurors allege facts showing misconduct and (2) those facts support a determination that the misconduct affected the verdict.

(Citations omitted.) *Ryan v. Westgard,* 12 Wn. App. 500, 503, 530 P.2d 687 (1975). The policy favoring stable and certain verdicts and the necessity of maintaining the secrecy of deliberation and frank and free discussion by all

jurors must yield: (1) if the affidavit(s) of the juror(s) alleges facts showing misconduct, and (2) those facts are sufficient to justify making a determination that the misconduct, if any, affected the verdict.

Affidavits of jurors may be considered only to the extent they do not attest to matters inhering in the verdict. *Gardner v. Malone*, 60 Wn.2d 836, 841, 376 P.2d 651, 379 P.2d 918 (1962). The individual or collective thought processes leading to a verdict "inhere in the verdict" and cannot be used to impeach a jury verdict. *State v. Ng*, 110 Wn.2d 32, 43, 750 P.2d 632 (1988). The rule first announced in *State v. Parker*, 25 Wash. 405, 415, 65 P. 776 (1901) remains the rule in Washington.[2]

> In considering the affidavits filed, we entirely discard those portions which may tend to impeach the verdict of the jurors, and consider only those facts stated in relation to misconduct of the juror, and which in no way inhere in the verdict itself. It is not for the juror to say what effect the remarks may have had upon his verdict, but he may state facts, and from them the court will determine what was the probable effect upon the verdict. It is for the court to say whether the remarks made by the juror in this case probably had a prejudicial effect upon the minds of the other jurors.

*See also Gardner v. Malone*, 60 Wn.2d at 840. As indicated by the above, ultimately the determination of whether juror misconduct in interjecting evidence outside of the record affected the verdict is within the discretion of the trial court.

> The effect which this evidence may have had upon the jury was a question which was properly determined in the sound discretion of the trial court which had observed all the witnesses and the trial proceedings and had in mind the evidence which had been presented. If the trial court had any doubt that the misconduct affected the verdict, it was obliged to resolve that doubt in favor of granting a new trial. *Gardner v. Malone, supra; Lyberg v. Holz*, [145 Wash. 316, 259 P. 1087 (1927), *aff'd*, 146 Wash. 698, 263 P. 960 (1928)]. The discretion of the trial court was properly exercised.

*Halverson v. Anderson*, 82 Wn.2d at 752.

---

[2]*See* Keefe, *Impeachment of Verdicts by Jurors' Affidavits*, 38 Wash. L. Rev. 339 (1963) for a comment on the question.

Here, the alleged misconduct was that juror Geisler's outside experience and expertise in a quasi–medical capacity, which she imparted to the jury, in combination with alleged outside evidence of the mother's illness as being capable of producing the injuries prenatally, prejudiced the jury deliberations so as to deny Richards a fair trial. The claimed misconduct was that Geisler had reviewed the medical records which were in evidence in the case and discovered the mother had suffered the flu some 20 weeks into the gestation period. In deliberations, juror Geisler allegedly stated it was her opinion that this illness explained a lot of the "injuries" or birth defects of the child as prebirth defects and that she did not support the theory advanced by the plaintiffs that the child's problems were the result of the negligence of the doctors. Plaintiffs contend this is extrinsic evidence which affected the verdict. *See Adkins v. Aluminum Co. of Am.*, 110 Wn.2d 128, 137, 750 P.2d 1257, *clarified*, 756 P.2d 142 (1988); *Halverson v. Anderson*, 82 Wn.2d at 752.

The court must make an *objective* inquiry into whether the extraneous evidence, if indeed any existed, could have affected the jury's determination and *not a subjective* inquiry into the actual effect of the evidence on the jury, because the actual effect of the evidence inheres in the verdict. *State v. Briggs*, 55 Wn. App. at 55. Juror misconduct involving the use of extraneous evidence during deliberations will entitle a party to a new trial if there are reasonable grounds to believe the party has been prejudiced. *See State v. Lemieux*, 75 Wn.2d 89, 91, 448 P.2d 943 (1968) (a criminal case where the "party" is the defendant). Any doubt that the misconduct affected the verdict must be resolved against the verdict.

"[A] new trial must be granted unless 'it can be concluded beyond a reasonable doubt that extrinsic evidence did not contribute to the verdict.'" *United States v. Bagley*, 641 F.2d 1235, 1242 (9th Cir. 1981) (quoting *Gibson v. Clanon*, 633 F.2d 851, 855 (9th Cir. 1980))[.]

*State v. Briggs*, 55 Wn. App. at 56.

However, in our opinion, a review of the affidavits of the jurors does not establish the introduction of new or novel evidence. The evidence of a viral infection at the 16– to 20–week stage of the pregnancy was before the jury from the testimony of one of the doctors and in the medical reports. Juror Geisler's background was known to the parties at the time of voir dire and her "medical" knowledge was something she naturally brought in with her to the deliberations, and this was known by all the parties after voir dire. The medical records were introduced into evidence and sent to the jury room with the jury for its use in the deliberations. There was no extrinsic evidence brought into the case and thus there was no misconduct.

The Richards also allege the comments made by Geisler at the time of deliberation were not within the realm of the kind of life experiences that a juror is expected to bring into the deliberations. The Richards contend that the information imparted by juror Geisler was highly specialized and was uttered in the vein of being an expert. The interpretation of the evidence interjected by Geisler may well be outside the realm of a typical juror's general life experience and would not usually be introduced into the jury's deliberations. *See Halverson,* 82 Wn.2d at 752; *see also Fritsch v. J.J. Newberry's, Inc.,* 43 Wn. App. 904, 907, 720 P.2d 845, *review denied,* 107 Wn.2d 1006 (1986). However, in this case, on voir dire juror Geisler's background was fully disclosed and the Richards did not remove her from the jury. This fact distinguishes the *Briggs* case upon which the Richards rely. In *Briggs,* the juror's nondisclosure of material information during voir dire in combination with the interjection of that information into the deliberation was deemed prejudicial. Here, there was full disclosure on voir dire by the juror in question about her background. The Richards knew this and chose to let her remain on the jury.

Although the affidavits of the jurors were in conflict, the trial court found the matters raised by the affidavits

inhered in the verdict and did not provide facts indicating that misconduct was established. The court said:

> [A]ll of the matters raised by the affidavits with regard to the alleged misconduct of juror Geisler inhere in the verdict. I would have been otherwise persuaded if she had done something extra–judicial, if you will, to the extent of bringing in a document into the courtroom or into the jury room that supported her position, but basically it seems to me that what she did was argue for a proposition, which I must state to you all as a person who is not involved in the case as much as you are, I wondered about as I was listening to the evidence. I assumed at the close of the evidence that it must have nothing to do with it because nobody said it did, but I wondered because of the same time period that some of these things happened whether the flu could have had something to do with it. So I don't believe that the plaintiffs have established misconduct and I think that's as far as I have to go on the legal analysis.

Given the standard of review, after reviewing the record it cannot be said that the decision of the trial court was an abuse of discretion. In fact we agree with the conclusion that misconduct has not been established.

### INSTRUCTIONAL ERROR

██ The Richards assign error to three of the court's instructions and to the court's failure to give three proposed corresponding instructions. The test for the sufficiency of instructions involves three determinations: (1) that the instructions permit the party to argue his theory of the case; (2) that the instruction(s) is/are not misleading; and (3) when read as a whole all the instructions properly inform the trier of fact on the applicable law. *Crossen v. Skagit Cy.*, 100 Wn.2d 355, 360, 669 P.2d 1244 (1983). However, a party's theory of a case need not be the subject of an instruction unless the theory is supported by substantial evidence at trial. *State v. Rice*, 110 Wn.2d 577, 605, 757 P.2d 889 (1988), *cert. denied*, 491 U.S. 910, 105 L. Ed. 2d 707, 109 S. Ct. 3200 (1989).

### Instruction 7

The Richards claim that instruction 7 was in error because it applied the wrong standard of care to Dr. Haeg. Instruction 7 as given by the court stated:

A physician who is a family practitioner has a duty to exercise the degree of skill, care and learning of a reasonably prudent family practitioner in the State of Washington acting in the same or similar circumstances at the time of the care or treatment in question. Failure to exercise such skill, care and learning is negligence.

If a family practitioner holds himself out as qualified to provide pediatric care, or assumes the care or treatment of a condition which is ordinarily treated by a pediatrician, he has a duty to possess and exercise the degree of skill, care and learning of a reasonably prudent family practitioner in the State of Washington acting in the same or similar circumstances at the time of the care and treatment in question. Failure to exercise such skill, care and learning is negligence.

The Richards allege the second paragraph of the instruction contains a flat misstatement of the law. We agree. Instruction 7 given by the court deprived the jury of the determination of whether Dr. Haeg should be held to the standard of care of a reasonably prudent family physician or to the standard of a reasonably prudent pediatrician, because the instruction as given assumed that regardless of the conclusion of the jury, Dr. Haeg was to be judged by the standard of care of a family practitioner.

However, in the posture of the case as tried and with the result as found by the jury, the improper instruction is of no moment and does not warrant reversal. First, the Richards argued at trial that Dr. Haeg had failed as a reasonably prudent *family practitioner* to earlier recognize the problem with low blood sugar was not resolved and to refer the child to a specialist. The Richards did not position or argue the case or submit substantial evidence to warrant the giving of the correct proposed instruction even though it was the properly worded instruction. *State v. Rice,* 110 Wn.2d at 605. Second, the verdict in the case indicated the jury necessarily found the cause of the harm to Michelle was due to some prenatal event. Therefore, the actions of the family practitioner after the birth of Michelle was of no consequence to the decision of the jury. Had the jury found the harm to be postnatal, by finding any of the defendants negligent, then it would have been prejudicial error to

instruct the jury with respect to the conduct of the general family practitioner in the manner in which it was instructed. However, because of the verdict, the error is harmless.

## Instruction 10

Instruction 10 as given by the trial court stated:

The degree of care actually practiced by members of the medical profession is some evidence of what is reasonably prudent—it is not dispositive.

The Richards proposed a second sentence to this instruction: "It is society and the patients to whom physicians are responsible, not solely their fellow practitioners." In addition, the written exceptions made by the plaintiffs excepted to removal of the word "only" before the words "some evidence" in the instruction given. Neither argument is correct.

The standard of care against which a health care provider is judged is generally established by expert testimony. *Douglas v. Bussabarger,* 73 Wn.2d 476, 479, 438 P.2d 829 (1968). This requirement has evolved to a standard of reasonably prudent medical care. Reasonably prudent medical care is not within the knowledge of lay persons. *Harris v. Groth,* 99 Wn.2d 438, 449 n.6, 663 P.2d 113 (1983). Thus, although the standard of care is not restricted to what is actually practiced, it must be determined by reference to expert testimony as to what is reasonably prudent. Contrary to the Richards' argument, the law does not permit a jury to base a standard of care on what it believes to be a prudent expectation of society or patients. Thus, the instruction as given was correct and the instruction proposed by the Richards was not.

## Instruction 19

The trial court's instruction 19 stated:

The evidence must rise to the degree of proof that any injury plaintiffs claim occurred to Michelle Richards probably would not have occurred but for defendants' conduct, to establish a causal relationship.

The Richards claim that the use of "any" was in error and that the court should have used "all or some portion of Michelle Richards' injuries" in its place. However, a closer look at the wording in the instruction given was that it involved "any injury plaintiffs claim occurred to Michelle Richards". Therefore, contrary to Richards' argument that they could prevail only by showing that the defendants' conduct was the exclusive cause of Michelle's brain damage, they were allowed to argue their theory of the case. This theory was that due to the defendants' negligence Michelle was injured. When read with the other instructions, specifically 14, 15, and 16, the instructions as a whole informed the jury that they could award damages for all, or any portion, of Michelle's injuries provided the Richards established, on a more probable than not basis, a causal relationship between the conduct and the injury.

The Richards allege that the instruction raises a detrimental inference as to the quality of their evidence and requires that they meet an additional burden of proof. Although probably more artfully drawn than the instruction in this case, the instruction approved in *Young v. Group Health Coop.*, 85 Wn.2d 332, 340, 534 P.2d 1349 (1975), indicates that in cases where proximate cause is a central issue, an instruction on the causal relationship of the alleged negligence to the resulting condition is appropriate.[3] The instruction in question in this case is a correct statement of the law and was not error.

The decision of the trial court is affirmed.

SWANSON, J., concurs.

---

[3]The instruction in the *Young v. Group Health* case provided as follows:

"You are instructed that the causal relationship of the alleged negligence of the defendants to the resulting condition of the child must be established by medical testimony beyond speculation and conjecture.

"The evidence must be more than that the alleged act of the defendants 'might have', 'may', 'could have', or 'possibly did' cause the physical condition.

"It must rise to the degree of proof that the resulting condition probably would not have occurred but for the defendants' conduct, to establish a causal relationship."

COLEMAN, C.J. (dissenting)—The majority acknowledges that Geisler's comments were the sort that usually would not be allowed to be introduced into deliberations. The majority's position, however, is that in leaving Geisler on the jury, the Richards accepted the risk that she would make such comments. I agree that because Geisler fully disclosed her background on voir dire, the Richards accepted the risks that her background might influence the manner in which she weighed the evidence and that others, knowing her background, might be influenced by her. However, in leaving Geisler on the jury, the Richards did not accept the risk that she would go beyond the facts and evidence of the case.

I believe that the majority has mischaracterized the alleged extrinsic evidence. The extrinsic evidence is not that Geisler reviewed Mrs. Richard's medical records and then stated that in her opinion, the flu, rather than negligence of the doctors, explained the defects of the child. Rather, the extrinsic evidence was that Geisler cited examples from her own experience to buttress her position and influence the others.

For example, when asked how it could be that a child could be sent home as normal and later turn out not to be normal, Geisler told the others that in her experience, that happens all the time. She said she knew of other children who were born with deficits that had not shown up right away. Geisler also said that it was common practice for doctors to record the previous diagnosis when making an entry in medical records, rather than to make an independent diagnosis. She said that based upon her experience working with retarded children, she knew that viral illness could cause brain damage and other birth defects. Even if the chance that all of Michelle's defects were caused before birth was one in 400 million, Geisler said that in her experience, it happens. Finally, she said that based upon her experience with children who had the same things wrong with them as Michelle had, she was convinced that Michelle was born with her defects.

An analogous situation would be if a lawyer were allowed to remain on a jury. A lawyer's experiences and legal training are bound to affect the way he or she evaluates the evidence of a case. Clearly, however, it would be prejudicial misconduct for a lawyer to emphasize his or her professional expertise and then to cite specific examples in an effort to influence other jurors.

Ordinarily, if jurors talk about their experiences, other jurors can balance that information against their own life experiences. What distinguishes Geisler's comments is that they reflect that she brought into the deliberations highly specialized information like that to which various experts testified at trial. *See State v. Briggs,* 55 Wn. App. 44, 58, 776 P.2d 1347 (1989); *see also United States v. Howard,* 506 F.2d 865, 867 (5th Cir. 1975). Because her experience was outside that of an ordinary juror, the others could not refute her statements. As such, her comments added credibility to the experts who testified on behalf of the defendants. *See Briggs,* at 56 (juror's comments rebutted the credibility of witnesses at trial). Because the jury's resolution of the dispute turned upon the credibility of each side's experts, the comments were prejudicial. *See Briggs,* at 56–57.

Respectfully, therefore, I dissent. I would reverse the judgment of the trial court and remand the cause for a new trial.

Review denied at 116 Wn.2d 1014 (1991).