[No. 19517-1-III.   Division Three.   February 20, 2003.]

CASEY DALTON, *Individually and as Personal Representative*, ET AL., *Appellants*, v. THE STATE OF WASHINGTON, ET AL., *Defendants*, CRAIG AMBROSON, ET AL., *Respondents*.

*Ron Perey* and *Carla T. Lawrence* (of *Law Office of Ron Perey*) and *James W. Grow, Jr.*, for appellants.

*Marc A. Lyons* (of *Ramsden & Lyons*) and *Christopher H. Howard* and *Kelly D. Cadigan-McGee* (of *Holland, Knight, L.L.P.*), for respondents.

*Kimberley Cross Berry*, pro se.

Schultheis, J. — In 1994, four-year-old Dirk Dalton was brutally beaten and killed by the foster father with whom he was temporarily residing while his mother was in a drug rehabilitation program. In the week prior to his death, Dirk's foster parents had brought him first to the office of pediatrician Dr. Craig Ambroson, and then, on three subsequent occasions, to the emergency room of Tri-State Memorial Hospital where he was treated by Dr. Cindy Rae Norman. The doctors noted bruises on Dirk's head and body during each of these visits, but accepted the foster parents' explanations of how they occurred.

Following Dirk's death, his estate and parents (Daltons) sued the foster mother, the two doctors, and Spectrum Emergency Care, Inc.[1] They contended the doctors committed malpractice in failing to recognize that Dirk was the victim of abuse. In addition, Daltons alleged that a factor in Dr. Norman's negligence in not recognizing abuse was her addiction to pain killers. They asserted that Spectrum, the agency that placed Dr. Norman at Tri-State Memorial, was liable both as her principal and separately for its own alleged lack of due care in performing its business of providing emergency room physicians to hospitals. The jury found only the foster mother negligent, and it awarded the plaintiffs only $4,900—the amount of Dirk's funeral expenses.

Daltons now appeal. They contend that the superior court erred when it denied their motion for a new trial. We agree with them that the trial was not fair because a juror intentionally concealed his actual bias against Casey

---

[1] A jury convicted the foster father, Kirk Cross, of homicide by abuse. The court sentenced him to 60 years' confinement. This conviction was affirmed on appeal by an unpublished opinion, *State v. Cross*, noted at 88 Wn. App. 1069 (1998).

Dalton. We therefore reverse the jury verdict and remand the cause to the superior court for retrial. In light of our holding, we do not address the remaining issues raised by Daltons in their appeal.[2]

Daltons' lawsuit arose out of the following facts: On the afternoon of May 1, 1994, emergency workers responded to a call from the home of Kirk and Kim Cross. On their arrival, Mr. Cross showed them Dirk Dalton, who was lying on the floor. The paramedics could not detect a pulse in Dirk and transported him to the hospital, where efforts to revive him were unsuccessful. Dirk had died of a ruptured duodenum, caused by some sort of blunt trauma to his abdomen, which he must have sustained several hours earlier. As a result of the trauma, the contents of Dirk's stomach and intestine had spilled into his abdominal cavity. Acute peritonitis set in, and death followed.

The Department of Social and Health Services had placed Dirk in temporary foster care with the Crosses on April 14, 1994, when Dirk's mother, Casey Dalton, entered a three-week drug rehabilitation program. On April 25th, Mrs. Cross took Dirk to the office of Dr. Craig Ambroson. She told Dr. Ambroson she was concerned because Dirk had several bruises. Mrs. Cross stated that Dirk had attended a carnival with her the day before and may have been jostled around during the carnival rides, but she thought the bruises were more than one would expect. Mrs. Cross asked Dr. Ambroson whether Dirk might be bruising too easily and whether that might indicate something serious. The doctor drew blood from Dirk to test for idiopathic thrombocytopenic purpura, a condition that leads to easy bleeding. The test results were normal. Dirk's hematocrit level was 35.7.

Two days later, on April 27, Mrs. Cross brought Dirk to the emergency room at Tri-State Memorial Hospital. Dr. Cindy Norman was the physician on duty. Mrs. Cross told

---

[2] "[T]he appellate court should avoid issuing advisory opinions on nondispositive issues that arose in the first trial which may, or may not, recur in the retrial." *Cox v. Gen. Motors Corp.*, 64 Wn. App. 823, 829, 827 P.2d 1052 (1992).

Dr. Norman that Dirk had fallen from the top bunk of a bunk bed. According to Mrs. Cross, he had hit the floor head first, and he had a laceration on his forehead from landing on what she described as matchbook toys that were on the floor at the time. Dr. Norman sutured the wound.

Dirk went to his regularly scheduled Head Start class on April 28. For several days, the staff there had noticed a reluctance on Dirk's part to get on the bus at the end of the class to return to his foster home. They were alarmed by the appearance of Dirk's head and asked Child Protective Services to investigate. The staff told Kirk Cross, who came to pick up Dirk, that Head Start would require the written permission of a physician before Dirk could return to school. Mr. Cross took Dirk to the emergency room where he was again examined by Dr. Norman. She signed the permission slip for Dirk's return to school.

On Saturday night, April 30, at 10:15 P.M., Mrs. Cross once again brought Dirk to the emergency room. Dr. Norman was again in attendance. Dr. Norman noted increased bruising which she attributed to blood moving gravitationally from the original trauma. Dirk now had the appearance of "raccoon eyes." Report of Proceedings (RP) at 2228. He vomited before he arrived at the emergency room and also after getting there. A CAT (computed axial tomography) scan of Dirk's skull did not reveal a fracture, but his hematocrit level had dropped to 25.3. Dr. Norman phoned Dr. Ambroson at his home and conferred with him about Dirk's case. The two doctors decided that Dirk could be sent home for the night, if the foster parents brought him in the next day for further testing.

Early the next morning, Mrs. Cross looked in on Dirk before she went to church. He was resting at that time. Mr. Cross remained at home with Dirk. At about 2 P.M., he called 911, telling the operator that Dirk was unconscious and nonresponsive. As stated above, Dirk was dead on arrival at the hospital. On June 2, 1994, hospital workers found Dr. Norman unconscious in her office. She tested positive for cocaine, opiates, and benzodiazepines.

A jury subsequently determined that Dirk died as a result of abuse by the foster father, Kirk Cross. The jury convicted Mr. Cross of homicide by abuse. He received a 60-year exceptional sentence.

Almost three years after Dirk's death, his estate and his mother and father brought this action against Drs. Ambroson and Norman for medical malpractice and failure to report suspected child abuse. They also sued Spectrum Emergency Care, as Dr. Norman's principal and for its alleged separate negligence in placing a drug impaired physician at Tri-State Memorial Hospital and not properly monitoring her performance. Pretrial discovery had revealed that Dr. Norman had been suspended from the practice of medicine because she was abusing alcohol and hydrocodone, a drug prescribed for pain relief, and had obtained the latter drug illegally. She was reinstated at some point before she began work at the hospital, and she was practicing medicine under a Washington monitoring program when she treated Dirk. However, she had relapsed before Dirk's death, was taking large doses of pain medication that she had fraudulently obtained, and was also abusing alcohol.

At trial, the parties called expert witnesses who gave conflicting opinions as to whether the doctors' treatment of Dirk fell below the standard of care and whether Dr. Norman's drug use caused her to misdiagnose the source of Dirk's bruises. The jury returned a verdict in favor of the doctors and Spectrum. It found only Kim Cross negligent, and it awarded Dirk's estate $4,900 damages against her, for Dirk's funeral and burial expenses.

The dispositive issue in Daltons' appeal from the judgments entered on the jury verdict is whether the superior court should have granted their motion for new trial based upon evidence that juror Donald Polumsky was biased against Casey Dalton and had concealed that bias during voir dire.

Daltons' motion for new trial alleged that in the same week as jury selection, prospective juror Donald Polumsky

had his hearing aid serviced at Pure Tone Hearing Aid Service. According to an affidavit filed posttrial by Starla Rae Beckley, a worker at Pure Tone, Mr. Polumsky stated that "he thought that Casey Dalton was an opportunist trying to profit from her child's death. He asked, where was the family then? Where was the Dad? He questioned why anyone would want to profit from a child's death." Clerk's Papers (CP) at 2187. She also stated that "he was very negative about Casey Dalton due to [a] prior run[-in] she had with [a] member [of his family]." CP at 2187. She did not recall the specifics of this confrontation, just that "[t]he family member was of the male [g]ender and a video store was discussed." CP at 2187.[3]

The critical statement in Ms. Beckley's affidavit is that Mr. Polumsky "thought that Casey Dalton was an opportunist trying to profit from her child's death." CP at 2187. Mr. Polumsky did not share that view with the court. The jury questionnaire asked whether the prospective juror believed there was anything that should be brought to the court's attention that might affect the juror's ability to be fair and impartial. Mr. Polumsky checked "No." CP at 2185. The court advised the jury pool collectively that it must "keep an open mind. . . . and . . . base any decision upon the law and the facts uninfluenced by any other consider-

---

[3] Daltons' counsel, Ron Perey, submitted his own declaration with his motion for new trial, in which he stated, as follows:

Ms. Beckley came forward of her own free will and provided the information in her declaration. Co-counsel Jim Grow met with her and prepared her declaration for her review and signature. She read it and signed it. Since, she has expressed reservations about becoming involved, saying that she is concerned she'll "get in trouble." She telephoned Mr. Grow's secretary and instructed her to tear it up. Mr. Grow's secretary, without consulting with Mr. Grow, tore up the original. Mr. Grow retrieved the declaration and taped it together. My office had already obtained the copy submitted with our Motion and Mr. Grow has advised Ms. Beckley that we are submitting it to the court. Ms. Beckley advises that her instructions to destroy her declaration and not use it are based on second thoughts about getting involved and possible ramifications to her significant other's business (the establishment that services Mr. Polumsky's and Erik Dalton's hearing aids) but that she does not dispute the truth of the matters declared. We provide this information so the court is fully apprised of these circumstances. Ms. Beckley has advised that if she were called to testify, she would confirm her declaration to be true.

CP at 2138.

ations." Supplemental Report of Proceedings (SRP) (Feb. 2-4, 2000) at 15. Mr. Polumsky did not respond when the court asked the jury pool, "Is there any prospective juror who has an ethical, moral or philosophical view which would cause you to feel uncomfortable . . . where one party is asking for . . . [a] money judgment against another party?" SRP at 45.

During the attorneys' voir dire of the venire panel, counsel for Dr. Norman and Spectrum inquired, "Is there anyone that the fact this involves foster care is more likely to believe any witness or less likely to believe any party to the case or witness to the case?" SRP at 166. No one responded. In individual voir dire of Mr. Polumsky, counsel asked, "[I]s there anything you think we might want to know about you . . . in terms of being a juror in this case?" SRP at 173. Mr. Polumsky stated only, "I always thought if you had children, it's your responsibility to take care of them. . . . [B]ut I don't know the whole situation, so I can't judge anybody." SRP at 174. "And when this kid has parents, I don't know what the problem is, where they were or anything else." SRP at 176.

Daltons' counsel asked the venire panel, "[T]his case involves a foster care situation. . . . Do you feel . . . that the mother herself is somehow at fault for her child's death?" SRP at 190. One of the venirepersons stated, "No amount of money is going to bring that little boy back. He's the one that suffered." SRP at 199. During individual voir dire of another venireperson, counsel asked, "Does that concept of placing a child in foster care . . . bother you?" SRP at 202. The venireperson answered, "Yes, sir, it does. . . . I don't see why parents can't make other arrangements than put them in with strangers." SRP at 202. Counsel then asked the entire panel: "[D]oes [the child being in foster care] impact how you might view this case . . . ?" SRP at 203. No one responded. The same venireperson who questioned why parents could not make other arrangements stated, "[P]ersonally I wouldn't trust one [a foster parent] with my children." SRP at 212. These two prospective jurors were removed by peremptory challenges.

When Ms. Beckley came forward after the verdict with her information about Mr. Polumsky's statements to her, Daltons moved for a new trial. In a letter ruling, the court denied the motion. It reasoned, as follows:

> While the community may have held various opinions on many aspects of this case, there has been no showing the jury that heard the evidence was anything but fair.
>
> Not only have there been no declarations from jurors reciting misconduct, but many of their comments reflect their rationale in deciding the case. The law is clear that a motion for new trial cannot be based on the content of the deliberations. These comments adhere in the verdict.

CP at 2870-71.

Daltons moved for reconsideration. The court denied the motion. It cited the declarations of Donald Polumsky and another juror, John Cook, filed by the defendants in response to Daltons' motion for reconsideration.

In his declaration, Mr. Polumsky stated, as follows:

> 2. At the end of the evidence portion of the trial, when the jurors went into deliberations to decide the case, my recollection is that the jurors discussed and based their decisions only upon the evidence that came in at trial. I do not recall any jurors bringing up any information during deliberations that was not part of the evidence presented at trial. I am not aware of, nor do I believe that any juror had personal bias for or against any of the parties based upon any experience outside of the trial. I do not recall nor do I believe there were any discussions by any jurors regarding any personal or family experiences any juror had relating to Casey Dalton.
>
> 3. Prior to being a juror in this case, I did not know Casey Dalton. It is my understanding that statements have been attributed to me to the effect that someone in my family had a "run in" with Casey Dalton that caused me to be negative toward her. I did not make such a statement. I do not know of any prior involvement between Casey Dalton and any of my family members, and I did not have a reason to have any negative feelings toward Casey Dalton prior to the trial.
>
> 4. I recall being questioned extensively during jury selection and that I responded honestly, including statements to the

effect that when a person had children, it was that person's responsibility to take care of those children.

CP at 4520-21. Mr. Polumsky's declaration did not deny Ms. Beckley's allegation regarding the statement we deem as critical—that he thought Ms. Dalton was an opportunist seeking to profit from her child's death.

Mr. Cook stated the jurors "focused on the judge's instructions and the evidence that was presented in the court room." CP at 2898. He did "not recall anyone in the jury room bringing up any information to be discussed outside the information that was presented in the courtroom," or "any discussion about any personal or family experiences any juror may have had relating to Casey Dalton." CP at 2898-99.

Based upon the above declarations, the superior court concluded that "[p]laintiffs have not made a sufficient showing to convince the Court that juror Polumsky committed misconduct, failed to disclose material facts in voir dire indicating bias or improperly prejudiced the jury deliberations." CP at 2924. Further, a hearing was not needed because Mr. Polumsky's affidavit "den[ied] misconduct," and the only evidence to the contrary was the hearsay statement of Ms. Beckley. CP at 2924.

Daltons contend that contrary to the superior court's finding, the record establishes that Mr. Polumsky concealed his actual bias, i.e., that Ms. Dalton was an opportunist trying to profit from her child's death. Daltons conclude he thereby violated their right to a fair and impartial jury. In these circumstances, Daltons believe the only remedy is a new trial, because Mr. Polumsky's concealment of his bias precluded them from challenging him for cause. They also dispute the superior court's reliance on evidence they allege inhered in the verdict—juror Cook's declaration regarding the jurors' thought processes. Daltons assert that the issue is not whether other jurors' deliberations were affected by Mr. Polumsky's bias; rather, the issue is whether Daltons were deprived of their right to a fair trial by 12 impartial jurors.

██ "One touchstone of a fair trial is an impartial trier of fact—'a jury capable and willing to decide the case solely on the evidence before it.'" *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984) (quoting *Smith v. Phillips*, 455 U.S. 209, 217, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982)). Our federal and state constitutions provide that the right of trial by jury shall "be preserved" and "remain inviolate." U.S. CONST. amend. VII; WASH. CONST. art. I, § 21. "The right of trial by jury means a trial by an unbiased and unprejudiced jury, free of disqualifying jury misconduct." *Smith v. Kent*, 11 Wn. App. 439, 443, 523 P.2d 446 (1974). A juror's failure to speak during voir dire regarding a material fact can amount to juror misconduct. *Allyn v. Boe*, 87 Wn. App. 722, 729, 943 P.2d 364 (1997).

██ On appeal, the court "will disturb a trial court's decision to deny a new trial only for a clear abuse of that discretion or when it is predicated on an erroneous interpretation of the law." *State v. Cho*,[4] 108 Wn. App. 315, 320, 30 P.3d 496 (2001) (citing *State v. Briggs*, 55 Wn. App. 44, 60, 776 P.2d 1347 (1989)). In cases that involve a juror's alleged concealment of bias, the test is "whether the movant can demonstrate that information a juror failed to disclose in voir dire was material, and also that a truthful disclosure would have provided a basis for a *challenge for cause*." *Cho*, 108 Wn. App. at 321 (emphasis added). "[O]nly those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *McDonough*, 464 U.S. at 556. *See also In re Pers. Restraint of Lord*, 123 Wn.2d 296, 313, 868 P.2d 835, *clarified by* 123 Wn.2d 737, 870 P.2d 964 (1994) ("Any misleading or false answers during voir dire require reversal only if accurate answers would have provided grounds for a challenge for cause.").[5] If a juror knows that disclosure is the appropriate response to the court's

---

[4] *Cho* was an appeal from a criminal conviction. However, neither *Cho* nor the other cases cited in our analysis of this issue make any material distinction based upon whether the misconduct occurred in a criminal or civil trial.

[5] *Contrast Robinson v. Safeway Stores, Inc.*, 113 Wn.2d 154, 776 P.2d 676 (1989) (new trial warranted by juror's concealment of fact that would have provided a

and/or counsels' questions, then bias is conclusively presumed. *Cho*, 108 Wn. App. at 328. Whether the juror's bias actually affected the verdict is irrelevant. *Allison v. Dep't of Labor & Indus.*, 66 Wn.2d 263, 265, 401 P.2d 982 (1965).

Here, Mr. Polumsky represented to the court in the jury questionnaire that there was nothing that would affect his ability to be fair and impartial. He did not respond to the court's question of the jury pool about whether anyone had an "ethical, moral or philosophical view" that would cause them discomfort in entering a money judgment. SRP at 45. During individual voir dire, he shared only his unease with why anyone would place their child in foster care. He said nothing about viewing Ms. Dalton as an opportunist who wanted to profit from Dirk's death. Mr. Polumsky was present when another juror commented that money would not bring Dirk back. He was also present when that juror was removed from the panel by the exercise of a peremptory challenge. Finally, his declaration regarding Ms. Beckley's allegations addressed all the points she raised except for her statement that he told her he thought Ms. Dalton was an opportunist wanting to profit from her child's death. His declaration is silent on that point.

The only conclusion is that the reason Mr. Polumsky did not deny the statement or offer any additional material that would have explained the statement, was because he in fact made the statement and had nothing to offer that would change its meaning. On its face, the statement that the plaintiff in the action is an opportunist trying to profit from her child's death exhibits an actual bias on his part against Ms. Dalton and her cause of action. If Mr. Polumsky had revealed his bias during voir dire, the plaintiffs could have challenged his selection as a juror for cause. *See* RCW 4.44.170(2) (actual bias consists of "the existence of *a state of mind* on the part of the juror *in reference to the action, or*

basis for a *peremptory* challenge). We do not address this apparent conflict because, in Daltons' case, Mr. Polumsky's alleged statement that Ms. Dalton, a plaintiff in the present action, was an opportunist seeking to profit from her child's death would have been a reason to excuse him for cause. *See also Hill v. GTE Directories Sales Corp.*, 71 Wn. App. 132, 141, 856 P.2d 746 (1993).

*to either party*, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging").[6] (Emphasis added.)

Accordingly, we hold that the superior court's finding— that Daltons had not shown Mr. Polumsky was biased and that he concealed that bias during voir dire—is not supported by the evidence. In these circumstances, the superior court abused its discretion when it denied Daltons' motion for a new trial. *See Cho*, 108 Wn. App. at 320.

We also hold that the superior court's decision denying Daltons' motion for new trial was based in part on an erroneous interpretation of the law—that Daltons had to show that Mr. Polumsky's bias prejudiced the jury's deliberations. *See id.* Whether Mr. Polumsky injected his bias overtly in the jury's deliberations is irrelevant. *See Allison*, 66 Wn.2d at 265; *Mathisen v. Norton*, 187 Wash. 240, 246, 60 P.2d 1 (1936); *Alexson v. Pierce County*, 186 Wash. 188, 192, 57 P.2d 318 (1936); *Heasley v. Nichols*, 38 Wash. 485, 487, 80 P. 769 (1905). Hence, the focus by the dissent in the instant case is misdirected. The material question is not whether Mr. Polumsky's bias affected the verdict. Rather, the parties were entitled to have the case tried by impartial jurors, and Mr. Polumsky was not only biased, he concealed that bias. *See Cho*, 108 Wn. App. at 328. "Where [such] misconduct . . . is raised after the verdict has been returned by the jury, the single available remedy is the granting of a

---

[6] Ms. Beckley's report that Mr. Polumsky said, "Casey Dalton was an opportunist trying to profit from her child's death," is the only part of the allegation that is critical to our review. In his responding declaration, Mr. Polumsky denied that he or (to his knowledge) a family member ever had a "run in" with Ms. Dalton. And, his answers to questions on voir dire advised the court and the parties that he had concerns about why the parents had to put Dirk in foster care in the first place. However, his declaration does not contradict Ms. Beckley's allegation that he said Ms. Dalton was an "opportunist" seeking to "profit" from Dirk's death. And, while he asserts he answered honestly the questions asked of him during voir dire, he does not assert that he answered honestly the questions posed by the court and counsel to the panel generally.

new trial." 5 WAYNE R. LAFAVE, ET AL., CRIMINAL PROCEDURE § 24.9(f), at 607 (1999);[7] *see also Allison*, 66 Wn.2d at 265.

The doctors and Spectrum cite several cases in support of their argument that Ms. Beckley's hearsay affidavit cannot be used to impeach the jury's verdict. *See, e.g., State v. Jackman*, 113 Wn.2d 772, 777, 783 P.2d 580 (1989). But the cited cases do not involve concealed juror bias. "The existence of concealed bias or prejudice in a juror is not a matter that inheres in a verdict." *Smith*, 11 Wn. App. at 444 (citing *Allison*, 66 Wn.2d at 265).[8] "Neither does juror misconduct in giving a false answer to a material question propounded to the prospective juror on voir dire examination inhere in the verdict." *Smith*, 11 Wn. App. at 445 (citing *Drury v. Franke*, 247 Ky. 758, 57 S.W.2d 969 (1933)). In the Washington cases that have considered allegations that a juror concealed his or her bias against a party, affidavits containing hearsay statements of the juror in question were the means by which that bias was brought to the court's attention. *See, e.g., Robinson v. Safeway Stores, Inc.*, 113 Wn.2d 154, 156, 776 P.2d 676 (1989); *Cho*, 108 Wn. App. at 329; *Allyn*, 87 Wn. App. at 728. Hence, we hold the superior court erred when it refused to consider Ms. Beckley's affidavit as mere hearsay.

Mr. Polumsky has already had an opportunity to respond to Ms. Beckley's allegations. His declaration did not deny he made the statement, nor did it explain the statement. Since Mr. Polumsky did not dispute Ms. Beckley's declaration in this regard, remanding the case for a hearing is useless and unnecessary. *See State v. Mecca Twin Theater & Film Exch.*,

---

[7] "This is true even if the misconduct affected a single juror and that juror's vote was not needed (i.e., the jurisdiction accepted less than unanimous verdicts), as the juror participated in the deliberations and may have influenced others." 5 LAFAVE, *supra*, § 24.9(f), at 607.

[8] *Smith* held that a juror's untruthful answers on voir dire support the remedy of a new trial if truthful answers would have revealed information that would have prompted a party to exercise a peremptory challenge to remove the juror. This holding has been abrogated by the United States Supreme Court's holding in *McDonough*, which limits such reversals to situations in which the juror's answer would have established reason to excuse the juror for cause.

*Inc.*, 82 Wn.2d 87, 93, 507 P.2d 1165 (1973) (a remand for findings is not needed if the facts are not disputed).

In summary, we hold the superior court erred when it denied Daltons' motion for a new trial because the unrebutted declaration of Ms. Beckley established that Mr. Polumsky was biased against Ms. Dalton and her cause of action. He improperly concealed that bias when he did not truthfully respond to the court's and the lawyers' questions on voir dire. Mr. Polumsky's concealed bias violated Daltons' constitutional right to trial by an impartial jury. *Cho*, 108 Wn. App. at 321 (citing *McDonough*, 464 U.S. at 556). The appropriate remedy is a new trial. *See Allison*, 66 Wn.2d at 265.

Reversed and remanded.[9]

KURTZ, J., concurs.

SWEENEY, J. (dissenting) — I begin by acknowledging the obvious. The beating death of this four-year-old at the hands of his temporary foster father was a horrific tragedy. But the principles I apply here—deference to jury verdicts—and the result I would reach would be the same whether the verdict was a $4 million verdict against these defendants or, as here, a rejection of the plaintiffs' damages claim. The question before us is not the brutality of the crime. Rather, we are asked to review the mechanics of a jury trial to determine the collateral liability of the emergency health care providers. The jury found the doctors were not negligent in failing to investigate and report the child's suspicious injuries. It found the foster mother was negligent, but limited the amount of damages to out-of-pocket expenses.

The trial lasted about five weeks. Daltons (the child's mother, Casey Dalton, his father, James Hines, and the

---

[9] The court grants Dr. Norman's and Spectrum's motion to supplement the clerk's papers with the Order Granting Motion to Clarify Trial Record for Purposes of Appeal, signed by the superior court on April 22, 2002. That order clarifies that the superior court considered the declaration of Mr. Polumsky submitted in opposition to Daltons' efforts to obtain an order granting a new trial.

child's estate) were represented by able counsel. A properly instructed jury listened to all the evidence. The jury rejected Daltons' theory of the case and decided in favor of the doctors. An experienced trial judge, the Honorable Donald W. Schacht, considered extensive argument when Daltons filed a posttrial motion to set aside the verdict for juror misconduct. The focus of Daltons' challenge is the voir dire examination of juror Donald Polumsky and statements attributed to him by a stranger to the lawsuit, Starla Rae Beckley. Judge Schacht did not act hastily, but handed down two carefully considered letter opinions rejecting the hearsay assertions by Ms. Beckley, a nonjuror. And the judge concluded that there was no prejudice in any event. He then exercised the discretion vested in him by law and refused to invalidate the jury's verdict.

STANDARD OF REVIEW. Whether an allegation of juror bias requires a new trial is left to the discretion of the trial court. *Robinson v. Safeway Stores, Inc.*, 113 Wn.2d 154, 155, 776 P.2d 676 (1989); *State v. Cho*, 108 Wn. App. 315, 320, 30 P.3d 496 (2001); *Allyn v. Boe*, 87 Wn. App. 722, 729, 943 P.2d 364 (1997). We review, therefore, for abuse of that discretion. *Robinson*, 113 Wn.2d at 158. Discretion is abused if the court's decision does not rest on tenable grounds or tenable reasons. *Micro Enhancement Int'l, Inc. v. Coopers & Lybrand, L.L.P*, 110 Wn. App. 412, 430, 40 P.3d 1206 (2002); *Richards v. Overlake Hosp. Med. Ctr.*, 59 Wn. App. 266, 271, 796 P.2d 737 (1990).

The standard of review is more than just a ritual formula to be recited by a reviewing court. The abuse of discretion standard accepts that the trial judge is better suited, for many reasons, to make these discretionary decisions. This is particularly so with a question such as juror bias. Again, juror bias is not something that can be calculated with precision approaching mathematical certainty. The trial judge here had before him the witnesses, lawyers, jurors, and the parties. He heard what they said and observed the manner in which they said it. We are limited to a cold record. Thus, the trial judge, not this court, was in the best position to pass upon this motion.

It is the trial court that is best able to determine if the juror can set aside any preconceived opinion. The trial court is able to observe the juror's demeanor and, in light of the observation, interpret and evaluate the juror's answers to determine whether the juror will be fair and impartial.

*State v. Rempel*, 53 Wn. App. 799, 801-02, 770 P.2d 1058 (1989), *rev'd on other grounds*, 114 Wn.2d 77, 785 P.2d 1134 (1990). Daltons concede, and this record reflects, that the trial judge here was evenhanded, diligent, and experienced. Appellant's Br. at 41.

I dissent because I find the standard of review dispositive in this case. I may or may not have made the same decision. But I cannot say that the judge abused his broad discretion on these facts.

VOIR DIRE. Mr. Polumsky made no secret of his misgivings about his ability to render a verdict unstained by his emotions, prejudices, and preconceptions. During voir dire, Mr. Polumsky said the following when asked about his feelings toward the case:

> I always thought if you had children, it's your responsibility to take care of them. . . . But I do have a problem with child abuse and I have already kind of got an opinion. Whether I could override that and give a judgment, I don't know. I have some mixed feelings about it.
>
> . . . .
>
> . . . And when this kid has parents, I don't know what the problem is, where they were or anything else.

Supplemental Report of Proceedings (SRP) (Feb. 2-4, 2000) at 174, 176.

Now, to the uninitiated this may seem innocuous. But to an experienced jury trial lawyer these comments, in the context of this case, are huge red flags. They speak volumes about this juror's attitude toward the lawsuit in general and these plaintiffs in particular. The message was these parents should have been responsible for this child. And where were they? So to conclude that Mr. Polumsky was not candid is to misread this record.

There is no suggestion here that Mr. Polumsky was shading his answers because he wanted to serve on this jury, as in *Cho*, 108 Wn. App. at 317. *See also United States v. Colombo*, 909 F.2d 711, 713 (2d Cir. 1990); *United States v. Scott*, 854 F.2d 697, 699 (5th Cir. 1988). Mr. Polumsky also said: "I don't know the whole situation, so I can't judge anybody." SRP (Feb. 2-4, 2000) at 174.

BECKLEY'S ACCUSATION. Starla Rae Beckley, an employee of the hearing aid company Mr. Polumsky visited during the pretrial phase, filed a posttrial affidavit that Mr. Polumsky said he thought that Casey Dalton was "an opportunist trying to profit from her child's death." Clerk's Papers (CP) at 2187. Ms. Beckley also alleged Mr. Polumsky was acquainted with Casey Dalton and was biased against her due to a prior problem between Ms. Dalton and a member of Mr. Polumsky's family.

When the trial court inquired, Mr. Polumsky denied that he knew Ms. Dalton or had an axe to grind with the Dalton family. The court evidently believed him. That being so, the court did not necessarily believe everything Ms. Beckley said. An appellate court should not try to parse either an accusing third party affidavit or a juror's response to it with mathematical precision. First, as discussed below, because that is the trial judge's job and, second, because it cannot be done.

What Mr. Polumsky said to Ms. Beckley, what he meant by it, and what the context was, should not be decided on the basis of affidavits without benefit of cross-examination. Were these offhand comments? Did Ms. Beckley have a reason to dislike Mr. Polumsky or the defendants? Was she an attention seeker? Why did she later ask that her affidavit be destroyed? All this and probably much more goes to the weight that should be attached to the statement. Many of the potential jurors in this case expressed reservations about the propriety of damages here.

COMPARATIVE WASHINGTON CASES. The *Robinson* court upheld on appeal the trial court's exercise of its discretion in granting a new trial. *Robinson*, 113 Wn.2d at 155. The trial

court properly ruled that the plaintiff did not receive a fair trial because a juror was in fact prejudiced and failed to disclose this on voir dire. *Id.* at 158. The trial judge in that case also determined that the juror had injected his bias into the deliberations.

*Dean v. Group Health Cooperative of Puget Sound* presented a much more compelling case of bias than that before this court. *Dean v. Group Health Coop. of Puget Sound*, 62 Wn. App. 829, 816 P.2d 757 (1991). Six members of the venire were members of Group Health Cooperative, the defendant. One actually voted in that capacity. During deliberations one expressed concern that a plaintiff's verdict would affect the cost of her health care premiums. *Id.* at 833. The reviewing court nevertheless deferred to the trial judge: "Although the evidence presented to the trial court in support of the motion for new trial was in the form of declarations, the trial judge also had the advantage of observing the demeanor of the jurors during voir dire and throughout the trial, an advantage not available to this appellate court." *Id.* at 838.

Again, the question of whether a juror is guilty of misconduct is a factual question for the trial court, whose determination will not be disturbed absent a showing of an abuse of discretion. *Id.* at 837.

WEIGHING THE EVIDENCE. Assuming Mr. Polumsky in fact made the out-of-court statements attributed to him, they are at best opinions and expressions of uninformed feelings on the nonmaterial issue of the motives of the plaintiff parents in bringing this action, argued by both sides during the trial. For me, it is important to distinguish between an attitude or mere expression of opinion and a verifiable fact misrepresented by a juror in response to a direct question. *See, e.g., Cho*, 108 Wn. App. 315 (juror in a criminal case concealed the fact that he was a former police officer); *State v. Briggs*[10] (juror denied being a stutterer, when stuttering

---

[10] *State v. Briggs*, 55 Wn. App. 44, 776 P.2d 1347 (1989).

was an issue in the case); *Smith v. Kent*[11] (juror denied relevant fact that he was a trucker).

Here, the misconduct evidence was not compelling.

First, what we have here is a reported expression of Mr. Polumsky's opinion—his opinion, in a nutshell, was "this ain't right." Mr. Polumsky swore an oath to set aside his pretrial opinions and to decide the case on the evidence. The judge was confident that Mr. Polumsky and the rest of the jurors did just that.

Second, Mr. Polumsky's alleged opinion was communicated to the court by way of the hearsay declaration of a third party. Third, there was no suggestion that he injected his opinions into the jury deliberations, unlike the offending jurors in *Robinson, Cho, Briggs,* and *Kent.* In those cases, the jurors' deception played a critical role in the deliberations and the ultimate outcome of the trial, because the jurors failed to disclose an irrefutable fact and then went on to use that information to influence the jury verdict. In each of these cases, this was an important factor in the court's decision whether a new trial was necessary. The record here, by contrast, is that the jurors decided the case based on the evidence and the court's instructions.

PREJUDICE. The prejudicial effect of the juror's statements must be considered "even where such statements indicate the juror testified falsely on voir dire." *Tate v. Rommel,* 3 Wn. App. 933, 936, 478 P.2d 242 (1970). The ultimate question is whether his remarks affected the verdict. *Richards,* 59 Wn. App. at 271. As the court in *Briggs* noted, a juror's failure to disclose a material fact is not, standing alone, a prejudicial error affecting the essential fairness of a trial. It does not entitle a party to a new trial, unless "a truthful response by the juror would have provided the basis for a challenge for cause" or the failure to disclose otherwise deprived a party of a fair trial. *Briggs,* 55 Wn. App. at 52 (citing *McDonough Power Equip., Inc. v. Green-*

---

[11] *Smith v. Kent,* 11 Wn. App. 439, 523 P.2d 446 (1974).

*wood,* 464 U.S. 548, 556, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984)).

The thoughts of Judge Dale Green, a former distinguished member of this court, on the significance of a juror's opinions during the course of a jury trial are instructive here. In fact, so much so that I set them out in full:

> However, absent a showing that such violation prejudicially affected the outcome of the trial, the verdict should not be disturbed. Common experience indicates a juror, or a judge, may form impressions or opinions as to the outcome of a case as he hears each bit of evidence. These impressions or opinions may change from time to time throughout the case. Such opinions or impressions normally are not revealed, and they should not be revealed, until the case is ready for decision. Here, juror Cyrus revealed his private opinion after the first day of trial. It is not unreasonable to expect that many of the other jurors, had they been questioned during the trial, would have formed some like opinion as to the outcome as did juror Cyrus. If we were to adopt the trial court's conclusion that the mere revealing of his private opinion or impression constitutes such misconduct as to justify a new trial without a further showing that such misconduct prejudiced the outcome of the trial, it would open the door to interrogation of jurors after trial for the purpose of discovering such unrevealed opinions as a basis for the filing of a motion for new trial.

*Tate,* 3 Wn. App. at 937. Those words might have been written to describe the facts here.

In those decisions affirming the trial court's exercise of discretion in granting a new trial, the element of prejudice was invariably present. In *Allyn v. Boe,* a juror admitted knowing a key expert witness but then said nothing when asked if she could be fair to both sides. *Allyn,* 87 Wn. App. at 728. During deliberations, she told the other jurors, "he would testify to anything." *Id.* The reviewing court affirmed the trial court's decision to grant a new trial. "The [trial] court must make an objective inquiry into whether the extraneous evidence *could* have affected the jury's verdict, not a subjective inquiry into the *actual* effect." *Id.* at 729. "Whether such misconduct occurred *and* whether it was

prejudicial are matters within the sound discretion of the trial court, who saw both the witnesses and the trial proceedings, and had in mind the evidence." *Id.* at 729-30 (emphasis added).

*Richards v. Overlake Hospital Medical Center* was a damage action arising out of a badly damaged child, allegedly as the result of medical negligence during labor and delivery. One of the jurors had medical training, was an occupational therapist by profession, and worked with retarded children. *Richards*, 59 Wn. App. at 269. She offered opinions during deliberations based on all her personal experience—opinions which ran counter to the plaintiff's theory of liability. *Id.* at 273-74. The Court of Appeals affirmed the trial judge's denial of a motion for a new trial by means of a two-step inquiry: One, was it misconduct? And two, did it prejudice a party? *Id.* at 270. The *Richards* court explained: "A strong, affirmative showing of juror misconduct is required to impeach a verdict," because the law favors stable and certain verdicts. *Id.* at 271-72.

In *State v. Briggs*, a juror failed to disclose a stuttering problem, although a specific inquiry was made during voir dire. The question of a speech impediment was central to the defendant Briggs' defense. The juror then offered his personal experience as a stutterer during deliberations which substantially undercut Mr. Briggs' defense—Mr. Briggs was a stutterer and the assaulter was not. The Court of Appeals reversed, but only after noting that two requirements had been met: nondisclosure (which the court noted would not, by itself, have been enough to require reversal) and actual prejudice by use of the information during deliberations to influence the outcome of the trial. *Briggs*, 55 Wn. App. at 52.

In *State v. Cho*, a juror failed to disclose under appropriate questioning that he had been a police officer. *Cho*, 108 Wn. App. at 318-19. The juror then " 'really argued the point with the jurors that were hesitant to convict Mr. Cho. In the end, he managed to change their minds.' " *Id.* at 320

(quoting juror's affidavit). The judge denied a motion for a new trial. Even on such egregious facts, the Court of Appeals did not order a new trial, but remanded for an evidentiary hearing, "in which the parties may, if they choose, present additional testimony to illuminate juror number eight's answers on voir dire as well as statements he allegedly made to defense counsel after the verdict." *Id.* at 329. The court was reluctant to declare the trial court's order an abuse of discretion until the trial court had "the opportunity to consider the issue of implied bias, an issue not raised or briefed below." *Id.* Review of the question of implied bias "is best done on the basis of findings made after the parties have an opportunity to develop a record with that issue in mind." *Id.*

At a minimum, the trial judge here should be afforded the chance to hold an evidentiary hearing—a solution suggested by Daltons as an acceptable one. Instead, the results of a long, hard fought and expensive trial are being set aside on the strength of a single uncross-examined statement by a third party which, for all we know, the judge may have rejected completely, as was his prerogative.

Here, even if we accept that Mr. Polumsky expressed the alleged opinion, it is undisputed that the jury's verdict was based on the evidence and the court's instructions. The sole question is whether Mr. Polumsky could set aside his emotional response to the enormity of the crime and his distaste for the facts leading up to it and decide the case on the merits. This he was instructed to do, swore to do, and assured the court that he did do. Judge Schacht did exactly what the *Briggs* court instructed him to do.

CONCLUSION. Every juror brings to the courtroom prejudices, biases, opinions, and inclinations. Indeed, good trial lawyers try to seat a jury that is disposed to view the evidence favorably to their clients. The test for whether the trial was fair is whether the juror can set aside any preconceived notions, opinions, and biases, and decide the case based on the evidence and the judge's instructions. Mr.

Polumsky said he could do that. And Judge Schacht, who listened to the whole trial, was convinced that he could.

The assumption implicit in the majority opinion is that, despite affidavits to the contrary, and despite the court's unchallenged instructions to the contrary, Mr. Polumsky's feelings (they are not empirically verifiable facts) influenced the verdict. That is an assumption which is unsupported by this record.

I would affirm Judge Schacht's exercise of discretion. At the very least, I would permit him the opportunity to develop a record by remanding for a fact-finding hearing.

The perfect case was not tried here. But the perfect case has not been and never will be tried. The parties here are not entitled to a perfect trial. *Freeman v. Intalco Aluminum Corp.*, 15 Wn. App. 677, 686, 552 P.2d 214 (1976). The ultimate question of law is who should make the decision as to whether the process here was so flawed that it should be invalidated. And the answer is the trial judge should.

The integrity of every jury verdict is important, not just those verdicts of which we approve.

Motions for reconsideration denied March 21, 2003.