**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON

MARCH 12, 2026

*Steven, C. J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
MARCH 12, 2026

SARAH R. PENDLETON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STEVEN BEARD, individually and as the personal representative of THE ESTATE OF SUPAK BEARD, | ) ) ) ) | No. 103635-3 |
| Petitioner, | ) ) ) | |
| v. | ) ) ) | En Banc |
| THE EVERETT CLINIC, PLLC; OPTUM CARE SERVICES COMPANY; OPTUM CARE, INC.; and SHAILA H. GALA, MD, | ) ) ) ) ) | Filed: March 12, 2026 |
| Respondents. | ) ) ) | |

JOHNSON, J.—This case concerns a trial court's decision to issue a particular jury instruction, referred to as the exercise of judgment instruction, in a medical malpractice case. The plaintiff objected to the instruction by claiming it was inapplicable and by challenging its propriety in any case. The trial court disagreed and gave the challenged instruction. The Court of Appeals affirmed. *Beard v. Everett Clinic, PLLC*, 32 Wn. App. 2d 833, 558 P.3d 478 (2024). Based

on principles discussed in *Fergen v. Sestero*,[1] a medical malpractice case from 2015, we hold that the record contained sufficient evidence to justify the exercise of judgment jury instruction.

## FACTS AND PROCEDURAL HISTORY

Supak Beard was diagnosed with lupus in 1991. Lupus is an incurable, chronic autoimmune disease where a person's immune system attacks their own tissues and organs. A person with lupus can have symptom-free periods and symptomatic periods, referred to as flare-ups. The most common flare-up symptoms include joint, muscle, and chest pain; headaches; rashes; fever; hair loss; mouth sores; fatigue; shortness of breath; swollen glands; swelling in limbs and face; confusion; and blood clots.[2] The occurrence of flare-ups is generally unpredictable but may be triggered by stress or infection. An untreated flare-up can cause debilitating fatigue and organ damage. Individuals with lupus are generally under the lifelong care of specialized physicians called rheumatologists. Rheumatologists manage their patients' medication needs, treat flare-ups, and address lupus-related symptoms or complications.

Mrs. Beard established care with Dr. Shaila Gala, a rheumatologist, in 2007. Dr. Gala managed Mrs. Beard's lupus by prescribing various medications,

---

[1] 182 Wn.2d 794, 346 P.3d 708 (2015).
[2] https://my.clevelandclinic.org/health/diseases/4875-lupus [https://perma.cc/642M-MASM].

including prednisone, which is an anti-inflammation medication and immune suppressant. Over the years, Mrs. Beard's flare-ups typically affected her joints, causing joint pain and swelling, as well as fatigue. Mrs. Beard occasionally developed rashes and mouth sores. Dr. Gala treated those flare-ups with temporary increases in prednisone before tapering Mrs. Beard back down to a maintenance dosage.

From November 2017 through January 2018, Mrs. Beard had frequent periods of severe joint pain. Dr. Gala adjusted medication dosages, ordered imaging, evaluated Mrs. Beard's response to additional medications, closely monitored her lab results, and tested for infection. Mrs. Beard reported that her symptoms resolved after each treatment.

On February 5, 2015, Mrs. Beard went to the walk-in clinic, reporting feeling unwell and experiencing chills for 6 days. The walk-in clinic physician, Dr. Ma, ordered blood and urine tests and a chest X-ray. The blood and urine tests were negative for infection. The chest X-ray showed an abnormality in one lung, which the radiologist thought could indicate either a partial collapse[3] or just a problem with the imaging itself.[4] The radiologist said it was "less likely

---

[3] The radiologist used the term "atelectasis." https://www.mayoclinic.org/diseases-conditions/atelectasis/symptoms-causes/syc-20369684 [https://perma.cc/7XBK-97JY].

[4] The radiologist used the term "artifact," which refers to something seen on the image that is not present in reality within the patient's anatomy. https://radiopaedia.org/articles/radiological-image-artifact?lang=us [https://perma.cc/A4HH-H63H].

pneumonia." Ex. 435A at 7. Mrs. Beard denied having a cough or difficulty breathing. The radiologist recommended follow-up chest imaging. As a precaution against pneumonia, Dr. Ma prescribed antibiotics for 10 days. Mrs. Beard reported to the clinic the next day that her fever was gone and several days later that she felt well. *See* Ex. 435A.

At her next scheduled appointment with Dr. Gala on March 1, Mrs. Beard had a fever of 100.3°F and reported some minor joint pain. Dr. Gala reviewed the patient chart and learned about Mrs. Beard's visit to the walk-in clinic the previous month. Mrs. Beard reported feeling well for the rest of February. She also reported that her spouse had strep throat. Mrs. Beard denied having a cough, sore throat, or difficulty breathing. Dr. Gala assessed that Mrs. Beard responded well to high doses of prednisone, had some persistent abnormal liver enzyme levels, and noted that she had a fever with unspecified cause. Dr. Gala ordered more urine and blood tests to further investigate the cause of Mrs. Beard's abnormal temperature.

On March 2, Mrs. Beard called to report blood in her stool, an increased temperature of 100.7°F, and wrist pain. Dr. Gala ordered a stool sample and abdominal ultrasound. She referred Mrs. Beard to a gastroenterologist and had her staff arrange the appointment. Dr. Gala did not communicate that she suspected Mrs. Beard had an infection to the other physician, who had access to Mrs. Beard's electronic medical records. Dr. Gala monitored the preliminary findings each day

from the urine, blood, and stool tests, which took many days to return a final result. The ongoing results were negative for infection.

On March 22, Mrs. Beard had a follow-up appointment with Dr. Gala. She had a high fever and worsening symptoms. Later, after reviewing that day's test results, including imaging showing intestinal inflammation, Dr. Gala called Mrs. Beard and recommended she go to the emergency room. Several hours after being admitted, Mrs. Beard underwent repeat abdominal imaging, which showed that Mrs. Beard's small intestine had perforated and was leaking its contents into the surrounding area. Mrs. Beard immediately underwent surgery. On March 24, Mrs. Beard passed away while recovering from surgery. The pathology report later showed that Mrs. Beard had tuberculosis in her gastrointestinal tract.[5]

Mrs. Beard's spouse brought this medical malpractice suit on behalf of her estate against Dr. Gala and claimed the clinic where she practices was vicariously liable. Mr. Beard claimed that Dr. Gala failed to act within the standard of care in treating Mrs. Beard by not urgently referring Mrs. Beard to an infectious disease specialist on March 1 and 2, by not ordering a repeat chest X-ray, and by not communicating to the gastroenterologist that she suspected Mrs. Beard had an

---

[5] Tuberculosis is a rare bacterial infection that usually affects the lungs. https://www.mayoclinic.org/diseases-conditions/tuberculosis/symptoms-causes/syc-20351250 [https://perma,cc/8PNY-3RS7]. Intestinal tuberculosis is a rare form of tuberculosis, accounting for only one to three percent of all tuberculosis cases worldwide. https://www.ncbi.nlm.nih.gov/books/NBK556115/ [https://perma.cc/SF2V-9HNF].

infection. The case proceeded to trial. During trial, both parties introduced expert testimony relating to the standard of care and other elements of the claim. Dr. Gala also testified.

When the parties were proposing jury instructions, Mr. Beard objected to the exercise of judgment instruction and an accompanying jury instruction. He claimed they were slanted toward the defense's theory of the case and that they commented on the evidence. He also argued that insufficient evidence existed showing the exercise of judgment instruction was warranted. The trial court approved both challenged instructions, reasoning that based on the rationale and holding in *Fergen*, the evidence supported giving the instructions. 8 Verbatim Tr. of Proc. (VTP) at 1016. The trial court also gave the general standard of care jury instruction. The jury determined that Dr. Gala did not breach the standard of care and returned a defense verdict.

Mr. Beard appealed, repeating his objections to the jury instruction. The Court of Appeals rejected his arguments. Relevant to the issue here, the court explained that when determining whether to give the exercise of judgment instruction, courts must focus on the reasonableness of the choice made by the physician, rather than on the underlying reasoning for making that choice. Moreover, it explained that within the jury instruction, the phrase "in arriving at a judgment" did not refer to the physician's subjective reasoning for making the

treatment choice they made, but rather, it referred to the choice itself. Based on this reasoning and the facts of the case, the Court of Appeals concluded evidence supported giving the instruction. *Beard*, 32 Wn. App. 2d at 872-73.

In his appeal to this court, Mr. Beard challenged the Court of Appeals' interpretation of the phrase "in arriving at a judgment" and its determination that sufficient evidence justified giving the jury instruction. He also renewed his challenge to the propriety of the exercise of judgment jury instruction.[6] This court limited review, granting only the issue regarding what evidence is required when a trial court gives the exercise of judgment jury instruction.[7] Consequently, our analysis focuses on that issue and whether sufficient evidence supported giving the instruction.

## ANALYSIS

In a medical malpractice case, the plaintiff has the burden of proving the health care provider defendant breached the applicable standard of care, causing an

---

[6] The Washington State Association for Justice Foundation filed an amicus brief, urging this court to modify the exercise of judgment pattern instruction. Both parties reject its recommended language. We decline to reach this issue. Also, in line with Mr. Beard's position, it claims that a health care defendant must provide evidence that their thought process underlying their treatment plan complied with the standard of care. In response, the Washington State Medical Association, the Washington Chapter of the American College of Emergency Physicians, Washington Academy of Family Physicians, Washington State Hospital Association, and the American Medical Association filed an amici brief, contesting this position and emphasizing the narrow issue this court accepted for review.

[7] We recognize that some of Mr. Beard's arguments before this court are focused on undermining the giving of the instruction. To the extent Mr. Beard asks us to abandon the exercise of judgment jury instruction, we denied review of that issue.

injury or death. The term "standard of care" refers to the degree of care, skill, and learning expected of a reasonably prudent health care provider acting in the same or similar circumstances. RCW 7.70.040.[8] Parties generally elicit testimony from expert witnesses within the defendant's same health care field and specialty to establish the applicable standard of care. Often, health care providers within the same discipline will disagree regarding the exact boundaries of that standard. Ultimately, the jury must consider all the evidence and determine whether the defendant's care fell within the standard.

To guide the jury, trial courts provide instructions to inform jurors regarding the applicable law. Determining which instructions to give involves the parties proposing instructions, often relying on templates from the Washington Pattern Jury Instructions (WPI). The templates from WPI are developed by a committee and are not considered binding law. Rather, the templates are resources for parties and courts to determine appropriate instructions for the jury. Outside the jury's presence, the parties argue why the court should or should not include the proposed instructions. The trial court makes the final decision, and that decision is afforded broad discretion.

---

[8] "(1) The following shall be necessary elements of proof that injury resulted from the failure of the health care provider to follow the accepted standard of care:

"(a) The health care provider failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he or she belongs, in the state of Washington, acting in the same or similar circumstances."

A jury instruction is acceptable when it is supported by the evidence, allows the parties to argue their theories of the case, and properly informs the jury of the applicable law. A challenged jury instruction must be reviewed in the context of all the provided jury instructions given in the same case. *Fergen*, 182 Wn.2d at 803.

In this case, Mr. Beard's challenge focuses on instruction 12, which stated:

> A physician is not liable for selecting one of two or alternative courses of treatment, if, in arriving at the judgment to follow the particular course of treatment, the physician exercised reasonable care and skill within the standard of care the health care provider was obliged to follow.

1 Clerk's Papers at 23. This instruction is based on WPI 105.08 "Exercise of Judgment." Understanding the history of this jury instruction is helpful to our analysis.

A variation of this instruction dates back to at least 1912, where a trial court instructed the jury that the defendant physicians "are not liable for any damages or injuries consequent upon an honest mistake or an error in judgment in making a diagnosis" if the defendants acted "in accordance with recognized authority and good current practice." *Williams v. Wurdemann*, 71 Wash. 390, 395, 128 P. 639 (1912). The jury in that case returned a verdict for the plaintiff and found the defendants liable. In reviewing that decision, this court reasoned that the jury instruction reflected the law at the time that a physician could not "be held responsible for an honest mistake or error in judgment." *Nath v. Or. R.R. &*

*Navigation Co.*, 72 Wash. 664, 666, 131 P. 251 (1913); *see also Brydges v.*

*Cunningham*, 69 Wash. 8, 10-11, 124 P. 131 (1912).

Decades later, this court reviewed a similar version of the jury instruction:

"A physician is not liable for damages consequent upon an honest mistake or an error in judgment in making a diagnosis or in determining upon a course of procedure where there is reasonable doubt as to the nature of the physical conditions involved. If a physician brings to his patient care, skill, and knowledge he is not liable to the patient for damages resulting from his honest mistakes or a bona fide error of judgment. The law requires a physician to base any professional decision he may make on skill and careful study and consideration of the case, *but when the decision depends upon an exercise of judgment the law requires only that the judgment be made in good faith.*"

*Dinner v. Thorp*, 54 Wn.2d 90, 97-98, 338 P.2d 137 (1959). In *Dinner*, the jury

returned a verdict for the defendant physician. The plaintiffs appealed, assigning

several errors to the trial court, including the giving of the above error in judgment

instruction. This court held that the last sentence of the instruction was incorrect,

reasoning that the law required a physician to exercise judgment with the level of

skill and learning comparable to that of other physicians practicing in the same

field. Because this court agreed with the appellants' other assigned errors, we

reversed the jury verdict and remanded for a new trial.

In 1978, this court upheld another version of the instruction: A physician or

surgeon is not liable for an honest error of judgment if, in arriving at that judgment,

the physician or surgeon exercised reasonable care and skill, within the standard of

care he was obliged to follow. *Miller v. Kennedy*, 91 Wn.2d 155, 160, 588 P.2d 734 (1978). This court explained that exercise of judgment is part of practicing medicine.

In *Watson v. Hockett*, the defendant physician proposed the same instruction, but the trial court declined to give it, reasoning that the *Miller* holding had been affected by a subsequent case. 107 Wn.2d 158, 727 P.2d 669 (1986). This court clarified that *Miller* remained controlling and upheld the instruction. However, the *Watson* court declared that the word "honest," which qualified the term "error in judgment," should no longer be used in future instructions. 107 Wn.2d at 165. We stated, "[t]his 'error in judgment' instruction is, however, to be given with caution." *Watson*, 107 Wn.2d at 165. The *Watson* court explained that the instruction's use is limited to circumstances where evidence showed that a physician, facing a choice among medical techniques or diagnoses, exercised reasonable care and skill within the applicable standard of care. Because the instruction was not required and the trial court's flawed reasoning did not amount to prejudicial error, we affirmed the trial court's decision not to give the instruction. *See Christensen v. Munsen*, 123 Wn.2d 234, 867 P.2d 626 (1994) (upholding the modified instruction and reiterating the same limitations).

In 2002, the WPI committee changed the title of the instruction to Exercise of Judgment. The comment to the change reasoned that the term "error" was

potentially misleading because it suggested a situation where the doctor strayed from the normal standard of care but was immune from liability. Rather than eliminate the instruction, the committee modified the language to a neutral term. It concluded that the instruction is useful to remind the jury of the reality of medicine, which requires health care providers to exercise judgment when treating their patients. WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 105.08 (4th ed. 2002).

In 2015, this court upheld the exercise of judgment jury instruction in *Fergen*.[9] *Fergen* involved consolidated cases resolving two separate appeals. In the first case, factually, Mr. Fergen sought medical treatment for a small lump on his ankle that was causing slight discomfort. The physician examined Mr. Fergen's ankle, noted the lack of other symptoms, ordered an X-ray to determine potential structural defects, referred Mr. Fergen to an orthopedic specialist, and instructed Mr. Fergen to follow up with the physician as needed. The X-ray did not show any problems, although the radiologist suggested an ultrasound could be helpful if the ordering physician felt a soft tissue cyst. The physician concluded that the lump

---

[9] On the same day *Fergen*, a 5-4 decision, was published, this court published *Paetsch v. Spokane Dermatology Clinic, PS*, 182 Wn.2d 842, 348 P.3d 389 (2015). In *Paetsch*, the petitioner claimed the trial court erroneously gave the exercise of judgment jury instruction because the physician assistant misdiagnosed her condition. She contested that a misdiagnosis does not meet the requirement of showing the health care provider chose between two alternative diagnoses. She also challenged the propriety of the instruction altogether. This court unanimously rejected the petitioner's challenges to the instruction.

was a benign cyst and did not order an ultrasound. The lump was later discovered to be a rare, aggressive, and difficult-to-diagnose form of cancer, which led to Mr. Fergen's death.

In the second case, Mr. Appukuttan injured his leg playing soccer. He went to the emergency room five times over the following four days due to persistent and worsening pain and increasing firmness in the injured leg. He saw multiple physicians who each examined his leg and came to different conclusions. While the physicians looked for, but did not find, warning signs and symptoms of compartment syndrome (his eventual diagnosis), none of the physicians measured the pressure in Mr. Appukuttan's leg to rule out the syndrome definitively. The delayed diagnosis and treatment caused Mr. Appukuttan permanent injury.

Mrs. Fergen argued[10] that the trial court erred in using the exercise of judgment jury instruction because the evidence did not show that the physician made a conscious choice among competing diagnoses. Mrs. Fergen claimed that evidence of making one diagnosis cannot satisfy the requirement of the challenged jury instruction that the physician selected one of two or alternative courses of treatment. Relying on our prior case law discussed above, the *Fergen* court explained that the exercise of judgment instruction is justified when (1) evidence

---

[10] Mr. Appukuttan challenged only the propriety of ever giving the exercise of judgment jury instruction. We rejected this argument. *Fergen*, 182 Wn.2d at 805.

shows the physician made a choice among alternative courses of treatment (or diagnoses) and (2) evidence exists showing the physician exercised reasonable care and skill consistent with the applicable standard of care in formulating their judgment when making that choice. 182 Wn.2d at 806.[11]

Focusing on the first prong, the *Fergen* court declared that the requirement is satisfied when a physician exercises professional judgment in treating a patient or making a diagnosis. This court stated that the bar for meeting the standard was low and held "that evidence of consciously ruling out other diagnoses is not required; a defendant need only produce sufficient evidence of use of clinical judgment in diagnosis or treatment to satisfy a trial judge that the instruction is appropriate." *Fergen*, 182 Wn.2d at 799. This court reaffirmed that the trial courts are justified in using the jury instruction where sufficient evidence showed the physicians exercised their professional judgment in deciding how to assess and diagnose Mr. Fergen and Mr. Appukuttan. The articulated principles and rules from *Fergen* guide the resolution of the issue in this case.

Preliminarily, the parties do not dispute that Dr. Gala met the first requirement. As per *Fergen*, it was unnecessary for Dr. Gala to produce evidence of her conscious reasoning for opting out of potential steps that could have been

---

[11] For the purposes of our analysis, we are transposing the two requirements from how they appear in *Fergen* and will refer to them throughout this opinion as we have set forth above.

pursued, but were not, when treating Mrs. Beard. As required, Dr. Gala's March chart notes show evidence that she exercised professional judgment in treating Mrs. Beard that month, especially because she created a treatment plan that addressed all of Mrs. Beard's reported and observed health concerns on March 1 and 2.

Regarding the second prong of the analysis, Mr. Beard claims the trial court gave the exercise of judgment jury instruction without sufficient evidence that Dr. Gala's reasoning fell within the standard of care when arriving at the judgment to follow the particular course of treatment. Mr. Beard claims that the Court of Appeals, in affirming the trial court, erroneously held the rule does not require looking at how a physician arrived at a judgment to follow a particular treatment plan. Suppl. Br. of Pet'r at 6. The Court of Appeals explained that the phrase "in arriving at a judgment" does not refer to a physician's underlying reasoning for their decisions but, rather, referred to a physician's choice between treatments. *Beard*, 32 Wn. App.2d at 872. It held that "[p]roof that Dr. Gala's *reasoning* was consistent with the standard of care was not necessary." *Beard*, 32 Wn. App. 2d at 892 (emphasis added).

In *Fergen*, the opinion used the term "formulating" to describe what is required under our second prong. 182 Wn.2d at 806. In other words, "in arriving at a judgment" means the process a health care provider followed to make a decision.

In line with this requirement, evidence of a health care provider's decision-making process in selecting a treatment plan and diagnosis is needed for using the exercise of judgment jury instruction. A defendant health care provider's trial testimony ascribing an internal thought process to evidence of their decision-making process at the time of care may be useful to recreate the physician's likely frame of mind in response to new information. However, we recognize that circumstances may arise where the defendant physician is unavailable to testify at trial or where the time between treatment and a claim are so distant that the usefulness of the testimony is limited. Thus, process evidence does not require a health care provider's after-the-fact narrative characterized as their internal thought process during the time of care but instead focuses on objective evidence of their decision-making process. This evidence includes their actions, their experience in treating the patient's condition, and information from the patient's medical chart that was recorded throughout the time of treatment. The patient's medical chart is not limited to laboratory values and health data points; it includes the physician's firsthand observations, assessments, and impressions. Given that a physician will likely face a variety of choices along the way when reaching a diagnosis or treatment plan, the phrase "in arriving at a judgment" does not refer to the end choice but the steps the physician

16

took along the way to get to that choice, which are evidence of the decision-making process.[12]

This is consistent with principles from the *Fergen* analysis of the first prong, which does not require evidence that the physician consciously selected between reasonable competing diagnoses to demonstrate that they used their clinical judgment. The second prong sets a similarly low bar and does not require a physician defendant to demonstrate their conscious reasoning for every little decision along the way in formulating their treatment plan as long as the record shows some evidence of their decision-making process in response to the patient's health concerns at issue. *Fergen*, 182 Wn.2d at 812.

Here, the record contains evidence of Dr. Gala's process in treating Mrs. Beard on March 1 and 2, which included clinical observations and the patient's reported symptoms and history. The visit summary from March 1 shows that Dr. Gala was aware of Mrs. Beard's blood pressure, pulse, temperature (100.3°F), weight, joint-related symptoms, and abnormal liver enzyme levels from the prior visit. Dr. Gala noted Mrs. Beard's medical history since her last office visit, which

---

[12] Justice Mungia's concurrence misconstrues this analysis by characterizing our holding to mean that only the end result of the physician's actions are relevant to meet the requirements of this prong. We recognize that a health care provider's decision-making process is not necessarily so linear as having a starting point and an end result. When working up a patient's diagnosis, the physician does not start with the knowledge of the accurate diagnosis but, instead, is faced with various clues that can lead one in numerous directions. Each step taken in a health care provider's response to those clues should not be treated as a single end result but as part of the decision-making process to reach a diagnosis or treatment plan.

included being seen by another physician at the walk-in clinic and Mrs. Beard's

report of feeling better after being treated at that time for pneumonia. She noted

that Mrs. Beard's husband had strep throat. Dr. Gala also noted that Mrs. Beard's

joint symptoms, while still causing her discomfort, had mostly subsided compared

to her reported pain at an office visit in mid-January. The visit summary also

shows that Dr. Gala addressed Mrs. Beard's various health concerns that day. She

did so by increasing the prednisone to address a possible flare-up, ordering more

labs to determine whether her liver enzyme levels were still abnormal, and

ordering tests to determine if an infection was causing Mrs. Beard's fever instead

of it just being a symptom of a flare-up. *See* Ex. 435A at 1-8.

Furthermore, the record contains ample evidence of Dr. Gala's underlying

basis supporting her treatment plan. For example, at trial, she testified:

> [O]n March 1st, 2018, she had a lupus flare, and I reasonably treated
> her lupus flare involving her joints. At that visit day, there were issues
> that I wanted to address. She had one day of fever, and led me to check
> urine and blood cultures. And she had elevated liver tests that led me
> also to refer her to gastroenterology.
>
> But nothing in that day necessitated an urgent or emergent
> infectious disease consultation or with any other specialty.

6 VTP at 760. Dr. Gala explained why she continued to view Mrs. Beard's

symptoms as consistent with being a lupus flare: "My concern was that the

tapering [of the prednisone] went too fast and this led to the flare that she was

experiencing and that I wanted to get it back under control." 6 VTP at 815. Dr.

Gala explained her impressions regarding Mrs. Beard's fever on March 1—that it could be related to her spouse's sickness, that it was unlikely to be related to the resolved pneumonia from February, and that it could just be a symptom of the flare-up. *See* 6 VTP at 816-20. She explained that to rule out infection, she tested Mrs. Beard's blood and urine, which are the typical bodily fluids to test for infection.

The record also shows Dr. Gala's response to the other breach of care allegations. Dr. Gala explained that the new information she received on March 2 did not change her plan for treating Mrs. Beard because the tests for infection were tentatively negative and still pending. She explained that she did not consider the circumstances to warrant an urgent referral to an infectious disease specialist. 7 VTP at 913-14. As for not telling the gastroenterologist about Mrs. Beard's fever, Dr. Gala explained her reasoning—that such a step was unnecessary because the other physician knew how to evaluate patients. 6 VTP at 826-27. This evidence was provided in front of the backdrop of Dr. Gala's years of experience treating patients with lupus and specifically caring for Mrs. Beard. Thus, given Dr. Gala's actions, medical chart notes, experience treating Beard, and trial testimony, the record contains evidence of Dr. Gala's process in selecting a course of treatment.

To complete the second prong analysis, it is necessary to determine if the record also showed that Dr. Gala's process complied with the standard of care. Mr.

Beard claims that the record lacks such evidence because Dr. Gala's testimony explaining her actions did not match the expert witnesses' testimonies. Suppl. Br. of Pet'r at 17-18.

As the Court of Appeals correctly reasoned, "The existence of a dispute among the expert witnesses produces questions for the jury—it does not militate against issuing the challenged instruction." *Beard*, 32 Wn. App. 2d at 892. Although the instruction is never mandatory, a trial court is justified in giving the instruction where parties provide contradictory testimony regarding the standard of care when the defendant health care provider makes a decision about the course of treatment or diagnosis. The trial court does not decide whether the health care provider's care met the applicable standard. Instead, the court makes a threshold decision as to whether the evidence could support a jury finding that the provider's process and choices fell within the standard of care. In a case where the exercise of judgment instruction is given, the jurors are also told that "[t]he degree of care actually practiced by members of the medical profession is evidence of what is reasonably prudent. However, this evidence alone is not conclusive on the issue and should be considered by you along with any other evidence bearing on the question." WPI 105.01; s*ee also Harris v. Robert C. Groth, MD, Inc.*, 99 Wn.2d 438, 444-45, 663 P.2d 113 (1983) (explaining that the reasonably prudent health care provider standard encompasses a health care provider's actual practice along

with societal expectations); *Watson*, 107 Wn.2d at 166; *Richards v. Overlake Hosp. Med. Ctr.*, 59 Wn. App. 266, 277, 796 P.2d 737 (1990) (explaining that reasonably prudent medical care is not within a lay person's knowledge so the standard of care "must be determined by reference to expert testimony as to what is reasonably prudent"). Thus, when expert witnesses or the defendant health care provider offer testimony as to the standard of care in a certain situation, that evidence does not provide the only viable options for what actions fall within the standard of care. Rather, the testimony provides a framework for the jury to decide whether the defendant physician's actions fell within that standard. [13] When conflicting expert testimony is presented and each side has argued their theories of the case, the jury conclusion is entitled to respect.

Here, Mr. Beard's rheumatologist expert witness, Dr. Brown, asserted that on March 1 and/or 2, Dr. Gala was required to urgently refer Mrs. Beard to an infectious disease specialist, order new chest imaging, and inform the gastroenterologist about a possible infection. Knowing the outcome, Dr. Brown

---

[13] Justice Mungia's concurrence's overly simplified articulation of this analysis misconstrues what we are holding. We are not stating, or even suggesting, that a jury can make a finding as to the standard of care without the help of expert testimony. Expert testimony is needed to show evidence of what is reasonably prudent. But because experts in the same field will disagree on the appropriate boundaries of the standard of care under any given circumstances, we are stating that expert testimony is not conclusive—ultimately, the jury must decide whether the defendant health care provider's actions fell within the standard of care even though it is not necessarily deciding what the specific standard of care is.

reviewed Mrs. Beard's case and formed an opinion about the standard of care required on March 1 and 2.

Dr. Gala's rheumatologist expert witness, Dr. Volkmann, stated that the standard of care required Dr. Gala to consider the possibility of infection as part of her differential diagnosis on March 1. 6 VTP at 700. She testified that Dr. Gala did so and complied with the standard of care on March 1 by addressing all of Mrs. Beard's then current health concerns. 6 VTP at 613, 701, 704. She testified that as of March 1, Dr. Gala had no reason to make an urgent referral to an infectious disease specialist or to order a new chest X-ray. 6 VTP at 707-09. At the time the expert formed her opinion about the proper standard of care, she was given only the information that Dr. Gala had access to through March 1. After learning the outcome and reviewing the records between March 1 and March 24, Dr. Volkmann reaffirmed her opinion that Dr. Gala "definitely complied with the standard of care" when treating Mrs. Beard on March 1. 6 VTP at 617. Next, Dr. Volkmann disagreed with Dr. Brown's conclusion that Dr. Gala was required to refer Mrs. Beard to an infectious disease specialist on March 2 when her fever was slightly elevated. Dr. Volkmann explained that the 0.4°F increase in temperature was clinically insignificant and that Dr. Gala was still evaluating the possibility of infection. 6 VTP at 712. Dr. Volkmann testified that the standard of care did not require Dr. Gala to inform the gastroenterologist regarding her suspicion of

infection because the information was already contained in the patient medical record to which the specialist had access. 6 VTP at 717. Overall, Dr. Volkmann summed up her evaluation of Dr. Gala's process and actions by testifying that the standard of care did not require Dr. Gala to do anything differently. 6 VTP at 718. When describing the standard of care, Dr. Volkmann gave specific details that overlapped with Dr. Gala's testimony regarding her process. She also discussed other considerations that Dr. Gala did not specifically mention in her testimony or notes. Mr. Beard claims the additional considerations discussed by Dr. Volkmann show Dr. Gala's actions fell below the required standard of care. Because the expert witnesses' testimonies regarding the standard of care are meant to be informative rather than conclusive, we reject this claim.

Because the record contains substantial evidence that supports the jury finding Dr. Gala's process met the standard of care, we hold that the second prong of the *Fergen* rule was met.

## CONCLUSION

In summary, we hold that to justify using the exercise of judgment jury instruction, the record must contain evidence that the health care provider's process in selecting a treatment course or diagnosis, and the choice itself, complied with the applicable standard of care. We hold that process evidence may include the health care provider's actions, the health care provider's experience, the

patient's medical record, and notes or testimony showing the health care provider's thought process. We hold that the expert witnesses' testimonies are necessary, though inconclusive, for the jury to determine the boundaries of the standard of care. Considering the jury instructions as a whole, the instructions properly informed the jury of the applicable law, both parties argued their theories of the case, and the trial evidence supported giving the exercise of judgment instruction. Thus, the trial court acted within its discretion in giving the exercise of judgment jury instruction. We affirm.

_____
Johnson, J.

WE CONCUR:

_____

_____
Montoya-Lewis, J.

_____
Madsen, J.

_____

_____
Gordon McCloud, J.

_____
Yu, J.P.T.

No. 103635-3

STEPHENS, C.J. (concurring)—I agree with the majority that under the narrow facts of this case, the trial court did not abuse its discretion by giving the jury the proposed exercise of judgment instruction. In *Fergen v. Sestero*, this court held that trial courts have discretion to issue such an instruction when there is substantial evidence that a physician's process in choosing between alternative courses of treatment fell within the standard of care and that the end result also comported with the standard of care. 182 Wn.2d 794, 806, 346 P.3d 708 (2015). I dissented in *Fergen* and continue to believe that "the risks of misdirecting or confusing the jury outweigh any possible benefit to giving this slanted, argumentative instruction" and that it should be jettisoned because it unfairly bolsters one party's theory of the case. *Id.* at 824 (Stephens, J., dissenting); *see also Laudermilk v. Carpenter*, 78 Wn.2d 92, 100, 457 P.2d 1004 (1969) (trial courts should "avoid instructions which emphasize certain aspects of the case . . . slanted instructions, formula instructions, or any instruction other than those which enunciate the basic and essential elements of the legal rules necessary for a jury to reach a verdict").

1

As both the majority and concurrence recognize, this case does not present an opportunity to revisit *Fergen*, given our limited grant of the petition for review. Majority at 7 & n.7; concurrence (Mungia, J.) at 4. It should be emphasized, however, that an exercise of judgment instruction is never mandatory, and trial courts should carefully consider its necessity and impact in the context of all the jury instructions when deciding whether it is warranted in a particular case. As the concurrence urges, such consideration should result in trial courts issuing this instruction "sparingly." Concurrence (Mungia, J.) at 1.

I agree with the majority's conclusion that substantial evidence in the record supported the trial court's decision to issue the instruction in this case. Majority at 23. I believe this holding is narrow and the concurring opinion overstates its implications. The concurrence misunderstands the majority opinion as rejecting any requirement that the trial court examine the physician's process in reaching a treatment decision. But the majority's holding is not so ambitious. The majority notes that "the phrase 'in arriving at a judgment' does not refer to the end choice but the steps the physician took along the way to get to that choice" and "it is necessary to determine if the record also showed that Dr. Gala's process complied with the standard of care." *Id.* at 16, 19. This holding does not alter the status quo. In deciding whether to give an exercise of judgment instruction, there must be substantial evidence that the physician's process in reaching a treatment decision,

and the treatment itself, fell within the standard of care. The majority simply recognizes that "process evidence does not require a health care provider's after-the-fact narrative characterized as their internal thought process during the time of care but instead focuses on objective evidence of their decision-making process." *Id.* at 16. Thus, the majority notes that evidence of a physician's exercise of judgment in a particular case "may include the health care provider's actions, the health care provider's experience, the patient's medical record, and notes or testimony showing the health care provider's thought process." *Id.* at 23-24. Contrary to the concurrence's characterization, the majority has not altered the requirement that expert witness testimony establish the standard of care or diminished the requirement that substantial evidence exists to support a finding that the physician's process complied with the standard of care.

I certainly understand the concurrence's discomfort with continued use of the exercise of judgment instruction, as it may serve to overemphasize a defense theory that is adequately covered in the standard negligence instructions. This case does not present an opportunity to address such broader concerns, however, and they are not implicated in the majority's narrow holding. I respectfully concur.

Stephens, C.J.

*Beard v. The Everett Clinic*

No. 103635-3

MUNGIA, J. (concurring)—Trial courts may give an additional standard of care instruction, known as the exercise of judgment instruction, in medical negligence cases. A trial court may give the exercise of judgment instruction if the defendant is able to produce "sufficient evidence of use of clinical judgment in diagnosis or treatment" when treating the patient. *Fergen v. Sestero*, 182 Wn.2d 794, 799, 346 P.3d 708 (2015). Trial courts should give this instruction sparingly. *Watson v. Hockett*, 107 Wn.2d 158, 165, 727 P.2d 669 (1986). Because the instruction is in addition to the standard of care instruction, a trial court always has the discretion not to give it.

I agree with the majority that this instruction may be given only if the defendant's evidence supports a finding that their process in arriving at the treatment and diagnosis met the standard of care.[1] However, I disagree with the majority on what evidence a defendant must provide to make this showing.

---

[1] The standard of care is "that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which [the health care provider] belongs, in the state of Washington, acting in the same or similar circumstances." RCW 7.70.040(1)(a).

The majority holds that a jury can determine whether a defendant's process met the standard of care by simply looking at "the health care provider's actions, the health care provider's experience, the patient's medical record, and notes or testimony showing the health care provider's thought process." Majority at 23-24.

I disagree with this holding on two points.

First, to be eligible for the exercise of judgment instruction, a defendant must provide evidence of their thought process. A defendant's actions, the medical record, and the end result of the treatment are not sufficient evidence.

Second, the majority suggests that a jury can make a finding as to the standard of care without the help of expert testimony, disregarding long-standing precedent. This court has consistently held that lay people do not have the knowledge to determine what the standard of care is. Instead, an expert witness, who has the necessary education, knowledge, and experience, must define, and educate the jury as to, the standard of care. Accordingly, to be eligible for the exercise of judgment instruction, a defendant must present expert testimony that the defendant's thought process in determining the diagnosis or treatment fell within the standard of care. The expert witness may rely on health care records, their own experience, testimony from the defendant as to the defendant's thought processes, and other materials to reach their conclusion. However, contrary to the majority, a lay juror does not have the expertise to look at that same information and reach a conclusion on whether the defendant's thought process fell

within the standard of care. As our precedent establishes, they need the help of an expert

for that.

Accordingly, I would hold that to be eligible for the discretionary exercise of

judgment instruction, a defendant health care provider must (1) provide evidence of their

thought process in exercising their clinical judgment and (2) have expert testimony that

their thought process met the standard of care.

Here, the defendant met both these requirements. Accordingly, while I disagree

with the majority's reasoning, I would affirm the trial court's decision to give the

exercise of judgment instruction under the facts of this case.

### I.   OUR SCOPE OF REVIEW IS NARROW

The use of the exercise of judgment instruction "is limited to situations where the

doctor uses judgment to choose between alternative treatments or diagnoses." *Fergen*,

182 Wn.2d at 805. In *Fergen*, we held that a trial court may give the exercise of

judgment instruction when there is evidence that the defendant health care provider:

(1) Made a choice among alternative courses of treatment/diagnoses and

(2) In making their choice, exercised judgment that met the applicable standard of

care.

*Id.* at 806.[2]

---

[2] The majority refers to prongs one and two, as labeled here. This is a departure from *Fergen*,
which referred to prongs one and two in the opposite order:

We are not revisiting our decision in *Fergen*. Accordingly, the first prong of the test is not at issue here. Instead, we accepted review solely to address what evidence the defendant needs to provide to meet the second prong.

II.     THE DEFENDANT'S THOUGHT PROCESS GOES TO THE HEART OF WHETHER THEIR EXERCISE OF JUDGMENT MET THE STANDARD OF CARE

I agree with the majority that to satisfy the second prong of the *Fergen* test, there must be evidence that the defendant's process met the standard of care. Majority at 15-16. However, the majority states that "process evidence" does not require evidence of the defendant's thought process. *Id.* at 16-17. It holds that the second prong "does not require a physician defendant to demonstrate their conscious reasoning for every little decision along the way in formulating their treatment plan as long as the record shows some evidence of their decision-making process in response to the patient's health concerns at issue." *Id.* I disagree. The majority minimizes the importance of process evidence by suggesting that some health care decisions are too "little" for the court to be concerned about. On the contrary, to determine whether any person exercised good

---

In Washington, an exercise of judgment instruction is justified when (1) there is evidence that the physician exercised reasonable care and skill consistent with the applicable standard of care in formulating his or her judgment and (2) there is evidence that the physician made a choice among multiple alternative diagnoses (or courses of treatment).

182 Wn.2d at 806. For consistency, this concurrence follows the majority's numbering.

judgment, there must be some evidence of that person's thought process in exercising their judgment.

First, *Fergen* does not support the majority's position, as it claims. Indeed, the *Fergen* decision did not address what process evidence a physician must provide to qualify for the instruction. It addressed only whether there was sufficient evidence that a defendant health care provider made a choice between alternatives at all. *Fergen*, 182 Wn.2d at 806. Thus, *Fergen* does not provide the answer to the issue raised here.

Second, in this case of first impression, the majority concludes that a defendant's "process" must meet the standard of care. However, the majority does not define what it means by "process." Instead, the majority broadly decides that a trial court should simply look at whether the end result of the treatment met the standard of care. This is illogical. If the jury is to assess only the end result, the exercise of judgment instruction would be meaningless. The general medical negligence jury instruction is all that would be needed to properly instruct the jury.

The exercise of judgment instruction is supplemental and is available only when a health care provider makes a choice between treatment or diagnosis options. To be eligible for the instruction, there must be some evidence that the defendant's decision process, not merely the end result, met the standard of care.

The following hypothetical example illustrates the difference between an end result meeting the standard of care and the physician's process of arriving at that end result.

Patient Jones presents to general surgeon Dr. Smith with a high fever and extreme pain in her lower left leg. Patient Jones complains of having chills, nausea, and diarrhea. Dr. Smith examines patient Jones and notes that her left lower leg has swelling and red blotches, which are turning purple. Patient Jones explains to Dr. Smith that she had been out hiking two days prior, had fallen, and had to take splinters out of her lower left leg. Patient Jones also explains that she drank unfiltered water and accidentally sprayed bear repellant, some of which landed on her lower left leg.

Dr. Smith diagnoses patient Jones with necrotizing fasciitis because (1) patient Jones drank unfiltered water and (2) she sprayed bear repellant on her lower left leg. Dr. Smith emergently takes patient Jones to surgery to remove the affected tissue.

After surgery, the pathologist confirmed that patient Jones had necrotizing fasciitis. The standard of care requires that when a diagnosis of necrotizing fasciitis is made, the surgeon must take the patient emergently to surgery. Here, Dr. Smith's treatment of patient Jones met the standard of care.

However, Dr. Smith's thought process fell below the standard of care. The unfiltered water and bear spray were unrelated to the necrotizing fasciitis. Instead, the physical symptoms the doctor ignored were what a reasonably prudent general surgeon would have considered to reach the correct diagnosis.

Under the majority's view, because the other conditions were noted in the medical records—chills, fever, pain, nausea, diarrhea, red blotchy skin turning purple, and recent

exposure to wood splinters—there would be evidence in the record to support giving the

exercise of judgment instruction.  Indeed, the majority says exactly this in this case:

> Here, the record contains evidence of Dr. Gala's process in treating
> Mrs. Beard on March 1 and 2, which included clinical observations and the
> patient's reported symptoms and history. The visit summary from March 1
> shows that Dr. Gala was aware of Mrs. Beard's blood pressure, pulse,
> temperature (100.3°F), weight, joint-related symptoms, and abnormal liver
> enzyme levels from the prior visit. Dr. Gala noted Mrs. Beard's medical
> history since her last office visit, which included being seen by another
> physician at the walk-in clinic and Mrs. Beard's report of feeling better
> after being treated at that time for pneumonia. She noted that Mrs. Beard's
> husband had strep throat. Dr. Gala also noted that Mrs. Beard's joint
> symptoms, while still causing her discomfort, had mostly subsided
> compared to her reported pain at an office visit in mid-January. The visit
> summary also shows that Dr. Gala addressed Mrs. Beard's various health
> concerns that day. She did so by increasing the prednisone to address a
> possible flare-up, ordering more labs to determine whether her liver enzyme
> levels were still abnormal, and ordering tests to determine if an infection
> was causing Mrs. Beard's fever instead of it just being a symptom of a
> flare-up.

Majority at 17-18.

Following the majority's holding, the exercise of judgment instruction could be

provided merely because Dr. Gala documented Ms. Beard's multiple symptoms and the

actions that she took.  The majority's reasoning does not track the requirement that the

defendant exercised good judgment.  The medical findings by themselves, without

Dr. Gala explaining how those medical findings led to her diagnosis and treatment, are

not sufficient to qualify for the exercise of judgment instruction.

However, here, Dr. Gala also provided testimony as to her thought processes, as

the majority notes:

> "[O]n March 1st, 2018, she had a lupus flare, and I reasonably treated her
> lupus flare involving her joints. At that visit day, there were issues that I
> wanted to address. She had one day of fever, and led me to check urine and
> blood cultures. And she had elevated liver tests that led me also to refer her
> to gastroenterology. But nothing in that day necessitated an urgent or
> emergent infectious disease consultation or with any other specialty."

*Id.* at 18 (alteration in original) (quoting 6 Verbatim Tr. of Proc. (VTP) at 760). Dr. Gala

further explained why she continued to view Ms. Beard's symptoms as being consistent

with a lupus flare: "'My concern was that the tapering [of the prednisone] went too fast

and this led to the flare that she was experiencing and that I wanted to get it back under

control.'" *Id*. (alteration in original) (quoting 6 VTP at 815).

Thus, Dr. Gala presented evidence to the trial court not only of her treatment of all

of Ms. Beard's complaints but also of her thought process in forming her diagnosis and

treatment plan. This explanation is what qualifies Dr. Gala for the exercise of judgment

instruction.

III.     TO RECEIVE THIS ADDITIONAL JURY INSTRUCTION, THERE MUST BE EXPERT
TESTIMONY THAT THE DEFENDANT'S THOUGHT PROCESSES MET THE STANDARD OF
CARE

In addition to providing evidence of the defendant health care provider's thought

process, there must also be evidence that the thought process met the standard of care. A

lay jury does not have the knowledge to determine the standard of care on its own. I

disagree with the majority that a lay jury can look at health care records, the defendant's

skill and experience, and the defendant's ultimate decision and then glean from that

evidence, without the aid of expert testimony, that the defendant's process met the

standard of care. Instead, long-settled law in Washington requires expert testimony to establish the standard of care, with some exceptions not applicable here. *Richards v. Overlake Hosp. Med. Ctr.*, 59 Wn. App. 266, 277, 796 P.2d 737 (1990) (explaining that medical care is "not within the knowledge of lay persons," so the standard of care "must be determined by reference to expert testimony as to what is reasonably prudent").

Here, the majority opines:

> [W]hen expert witnesses or the defendant health care provider offer testimony as to the standard of care in a certain situation, that evidence does not provide the only viable options for what actions fall within the standard of care. Rather, the testimony provides a framework for the jury to decide whether the defendant physician's actions fell within that standard.

Majority at 21. This statement has the potential to be construed as allowing the jury to determine what the standard of care is without expert testimony. While the jury makes the ultimate determination of whether the defendant met the standard of care, a jury cannot determine the standard of care based on its own sense of how a medical provider should have conducted treatment. *Richards*, 59 Wn. App. at 277 ("[T]he law does not permit a jury to base a standard of care on what it believes to be a prudent expectation of society or patients."). It is important to stay true to our precedent and affirm that the standard of care must be defined by expert testimony.

Where, as here, the health care provider's thought process must meet the standard of care, the reasonableness of the thought process must be supported by expert testimony. Otherwise, a defendant does not qualify for the exercise of judgment instruction.

9

IV.  THERE WAS EVIDENCE THAT DR. GALA'S THOUGHT PROCESS MET THE STANDARD OF CARE THUS ALLOWING THE TRIAL COURT TO GIVE THE EXERCISE OF JUDGMENT INSTRUCTION

To sustain the trial court's decision to give the exercise of judgment instruction here, there must be (1) evidence of Dr. Gala's thought process in reaching her diagnoses and treatments and (2) expert testimony that Dr. Gala's thought process met the standard of care.

The plaintiff alleged that Dr. Gala was negligent in her treatment of Ms. Beard by failing to do the following:

1. Failing to order follow-up imaging after Dr. Gala saw Ms. Beard on March 1, 2018;

2. Failing to refer Ms. Beard to an infectious disease specialist on March 1, 2018;

3. Failing to refer Ms. Beard to an infectious disease specialist on March 2, 2018;

4. Failing to alert the gastroenterologist of a suspected infection.

Suppl. Br. of Pet'r Beard at 3.

As discussed below, there was evidence of Dr. Gala's thought process for each decision backed by expert testimony that the thought process met the standard of care. Therefore, the trial court did not abuse its discretion in giving the exercise of judgment instruction here.

A.  <u>Dr. Gala's Decision Not To Order Follow-up Imaging</u>

Dr. Gala provided evidence of her thought process in deciding not to order follow-up imaging on March 1. Dr. Gala testified that she did not order repeat chest imaging

10

because Ms. Beard did not complain of coughing or shortness of breath. 6 VTP at 819.

In addition, Dr. Gala listened to Ms. Beard's lungs and they sounded clear. *Id.*

Dr. Gala provided an expert witness, Dr. Volkmann, who opined that Dr. Gala's

thought process met the standard of care. Dr. Volkmann testified that the standard of

care required Dr. Gala to consider Ms. Beard's response to the antibiotics, which she did.

*Id.* at 746, 751-52. Dr. Volkmann also testified that the standard of care required

Dr. Gala to consider the physical examination findings, which Dr. Gala did. *Id.*

Accordingly, for this diagnosis and treatment, the trial court had evidence of what

Dr. Gala's thought process was in reaching her treatment plan and evidence that the

thought process met the standard of care.

B. Dr. Gala's Decision Not To Make a Referral to an Infectious Disease Specialist on March 1 and March 2

Mr. Beard alleges that Dr. Gala fell below the standard of care by not referring

Ms. Beard to an infectious disease specialist both on March 1 and on March 2. As there

was no evidence that a referral on March 1 would have resulted in any different outcome

than a referral on March 2, the only evidence that the trial court needed to consider was

Dr. Gala's thought process on March 2.

Dr. Gala explained her thought process as to why she did not refer Ms. Beard to an

infectious disease specialist on March 2: Ms. Beard's blood and urine tests had, up to that

time, been negative. 7 VTP at 913-14. Dr. Volkmann opined that Dr. Gala's thought

process in making this decision met the standard of care. 6 VTP at 617-18, 697, 700-02,

707-10, 712-14, 742.

C. <u>Dr. Gala's Decision Not To Alert the Gastroenterologist of Her Suspicions
That Ms. Beard May Have an Infection</u>

Mr. Beard alleges that Dr. Gala breached the standard of care by not informing the gastroenterologist that Dr. Gala thought Ms. Beard may have had an infection. Dr. Gala testified about her thought process in making that decision: the gastroenterologist would do their own evaluation of Ms. Beard and would have access to the health care records. 7 VTP at 917-18, 967. In addition, Dr. Gala testified that she was going to wait for the results from the final cultures of the blood and urine tests. 6 VTP at 820-23, 7 VTP at 913-14. This is because the information she had up to that date made infection less likely than a flare-up of Ms. Beard's lupus. Dr. Volkmann opined that Dr. Gala's thought process in making this decision met the standard of care. 6 VTP at 618, 697, 709, 712-14, 717, 746-48.

Altogether, the trial court did not abuse its discretion in giving the exercise of judgment instruction. There was evidence of Dr. Gala's thought process for each decision and expert testimony that each decision met the standard of care.

## V. CONCLUSION

The bottom line for any plaintiff in a medical negligence case is to convince the jury that the defendant's treatment fell below the standard of care and the treatment was a cause of the plaintiff's injury. The plaintiff must present expert opinion evidence to establish the standard of care.

The defendant need not present any evidence of their thought process in reaching their diagnosis or treatment plan. As long as the jury does not find that the defendant health care provider breached the standard of care, it is irrelevant how the defendant reached their conclusions.

However, if the defendant wants to request the exercise of judgment instruction, they must support the request with specific evidence: their thought process in reaching their diagnosis or treatment plan and expert testimony that this thought process met the standard of care. If they have done this, then the trial court may, but is not obligated to, give the exercise of judgment instruction.

I disagree with the majority to the extent that it holds that a defendant's process is not their thought process, and to the extent that it holds that a jury can determine what the standard of care is for that process without expert testimony.

Because in this case the defendant provided evidence of her thought process and expert testimony that her thought process met the standard of care, the trial court did not abuse its discretion by giving the exercise of judgment instruction. Accordingly, I respectfully concur.

_____
Mungia, J.

_____
González, J.

_____
Whitener, J.

14